IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 1, 2011 Session

## DEAN G. HAFEMAN v. PROTEIN DISCOVERY, INC., A TENNESSEE CORPORATION

Appeal from the Chancery Court for Knox County
No. 171247-3     Michael W. Moyers, Chancellor

No. E2010-00660-COA-R3-CV - Filed February 28, 2011

This is a breach of employment contract action filed by Dean G. Hafemen ("the Employee") against Protein Discovery, Inc., a Tennessee corporation ("the Employer" or "the Company") after the Employer terminated the Employee's employment before the expiration of the term of his "Amended and Restated Employment Agreement" ("the Agreement"). The complaint alleges that the Employee is entitled to certain severance benefits provided for in the Agreement for any termination that does not qualify as a "Termination For Cause" as defined in the Agreement. After a bench trial, the court found that the termination was for cause and entered judgment in favor of the Employer. The Employee appeals. We reverse.

**Tenn R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and JOHN W. MCCLARTY, J., joined.

Danny P. Dyer, Knoxville, Tennessee, for the appellant, Dean G. Hafeman.

Ian K. Leavy, Chattanooga, Tennessee, for the appellee, Protein Discovery, Inc.

**OPINION**

I.

A.

The Employer is a "high-tech startup" company located in Knoxville. A complete description of its field of expertise is beyond the scope of this opinion and the proof in the case. It is sufficient to say that it is in the business of developing products for use in analyzing biological samples for protein content. The specific product on which the Employee worked was the to-be-developed "Passport System," a system for analyzing protein content in a biological sample with a mass spectrometer. Mr. Charles Witkowski, the president and CEO of the Employer, testified that the company could not have developed the technology of the Passport System without "someone with the scientific expertise [of the Employee]." It is undisputed that approximately six months after the Employee was terminated, the Passport System went into commercial production and sales, and the Company was able to secure a third round of venture capital of up to ten million dollars.

The Employer first retained the Employee in 2003. He was initially engaged as a consultant. He is an analytical chemist with a Ph.D. in biochemistry. At the time of the engagement, the Employee had approximately 20 years of experience working with scientific start-up companies. After approximately one month as a consultant, the Employer and the Employee entered into a written employment agreement that made the Employee the Company's director of research and development. Upon securing funding to the tune of approximately $5,000,000 projected to carry the company "through product launch and into sales," the parties executed an amended written employment agreement which we have previously defined as "the Agreement."

The Agreement treats all terminations as either a "Termination Without Cause" or a "Termination For Cause." Any termination that does not qualify as a Termination For Cause, other than for death or disability of the Employee[1], is deemed a Termination Without Cause. In the event of a Termination Without Cause the Employee is entitled to receive certain severance benefits, including the vesting of unvested stock options and his salary for 18 months following the termination. The Employee's monthly salary in September 2007 was approximately $11,000.

Termination For Cause is the subject of paragraph 13 of the Agreement. It provides:

---

[1]The Agreement has specific provisions for termination in the event of death or disability. Those provisions are not relevant to this dispute.

(a) Notwithstanding any other provisions of this Agreement, *the Company may, at any time, upon notice to [the] Employee, effect a Termination For Cause*. For purposes of this Agreement, *"Termination For Cause" shall mean the termination of [the] Employee's employment by the Company due to [the]* Employee's:

(i) dishonest conduct or the commission of a crime involving moral turpitude, in either case which has a material adverse effect on the reputation, goodwill, or business position of the Company;

(ii) intentional, material damage to the property or business of the Company;

(iii) theft, embezzlement or misappropriation of Company property;

(iv) *failure to follow reasonable, unambiguous, written procedures, directives or policies of the Company or the Board that are not inconsistent with the terms of this Agreement*, or

(v) breach of any material term of this Agreement, if such breach is not cured within ten (10) days following the Company's notice of such breach to Employee.

Notwithstanding the above to the contrary, by its nature, *Termination For Cause is intended to address only those serious acts or omissions committed by Employee that adversely affect the Company's business in a material respect*. Termination by the Company for all other reasons, other than by reason of employee's death or disability, shall be considered Termination Without Cause (as defined below).

(b) *The termination notice* given to [the] Employee by the Company pursuant to Section 13(a) above *shall indicate the specific clause in the definition of "Termination For Cause" relied upon by the Company and set forth the facts and circumstances claimed by the Company to provide a basis for termination*.

> (c) Upon a Termination For Cause, the Company shall have no
> further obligation to make payments or provide benefits to [the]
> Employee under this Agreement [other than earned salary, out-
> of-pocket expenses, and vested pension benefits].

(Underlining and capitalization in original; italicized emphasis added.) Paragraph 21 of the Agreement states that all "notices . . . shall be in writing."

The Company terminated the Employee by telephone call. The termination was by vote of the Company's board of directors on September 20, 2007, acting upon the recommendation of the CEO. The CEO, joined by the Chairman of the Board, called the Employee at his home in California immediately after the board meeting to inform him of his termination. The first written notice to the Employee was by letter to his counsel dated October 15, 2007 – some 25 days after the phone call – a copy of which was forwarded by the Company to the Employee via electronic mail dated October 16, 2007. The letter states in pertinent part:

> This letter will . . . serve as notice to [the Employee] that [the
> Employer] has terminated [the Agreement]. The . . . Agreement
> has been terminated for "cause" as defined under Section 13 of
> the . . . Agreement. Specifically, [the Employee] has:
>
> 1. repeatedly failed to carry out written directives from the
> Company's President and Chief Executive Officer, which
> directives were not inconsistent with the terms of the . . .
> Agreement,
>
> 2. failed to manage his direct responsibility of meeting clearly
> defined and agreed to research and development milestones; and
>
> 3. committed dishonest conduct in connection with his reported
> timekeeping records.

By the time the Employer formulated it answers to interrogatories, it had abandoned all grounds for termination other than failure to follow written directives of the CEO. In answer to an interrogatory asking for "all the reasons" for the termination, the Employer responded:

> Specifically, [the Employee], among other things, ignored the
> explicit instructions of [the Employer's] President by soliciting

-4-

the resignation of a co-worker; failed to develop a cartridge manufacturing protocol as directed by [the Employer's] President; and failed to properly prepare for a key presentation explaining [the Employer's] products at a significant industry seminar. During his presentation, [the Employee] substantially exceeded his allotted time, misrepresented [the Employer's] technology, and engaged in a verbal confrontation with a seminar participant.

The Employer's position at trial was that its answer to the interrogatory correctly stated the reasons for the termination.

The "cartridge manufacturing protocol" problem involved a disposable cartridge that was an integral part of the Passport System. The "protocol" was a sort of recipe or set of step-by-step instructions for manufacturing the cartridge. The Employee was in charge of developing the protocol. Mr. Witkowski, the CEO, was in charge of the research and development team as a whole. Mr. Witkowski, as the Employee's immediate superior and head of the research and development team, gave the Employee a deadline for developing and signing a protocol. A working protocol was developed during the Employee's tenure that allowed the cartridge to be manufactured in research and development and supplied to potential customers and collaborators. However, the Employee characterized the working protocol as a sort of interim measure that was not final. He testified that he was unwilling to sign-off on any protocol that was not final in the sense that, if followed, it would produce an acceptable, marketable product so as to allow for the formal launch of the product for mass manufacturing and public sale. The Employee testified that despite the best efforts of the development team the cartridge as manufactured by the working protocol had an unacceptably short shelf life because of an unsolved contamination problem. The CEO agreed that the working protocol was not an acceptable final protocol, and further agreed that there was an unsolved contamination problem with an unacceptable shelf life. However, the CEO testified that he nevertheless instructed the Employee to sign the working protocol. The CEO's justification was that until they settled on some concrete protocol, they could not progress toward perfection by eliminating what did not work. The CEO admitted, however, that the working protocol, though not signed by the Employee, was a written set of steps that could be followed by R&D to manufacture the cartridge on an experimental basis. Being in writing, of course, it could be used as a starting place for what did not work. Further, the CEO admitted that as the CEO he could sign the working protocol and make it "the protocol" without the Employee's signature. It was also undisputed at trial that the cartridge was completely redesigned after the Employee's termination and before product launch and that any protocol the Employee would have signed would have been useless.

The matter of "soliciting the resignation of a co-worker" concerned Jeremy Norris. Norris holds a Ph.D. in mass spectrometry from Vanderbilt University. He was the only mass spectrometry expert on staff at the Company. At the time of the problem between Norris and the Employee, Norris worked under the supervision of the Employee. Norris became the new director of research and development upon the Employee's termination. The Employee admitted at trial that he "went too far" in sending an email to Norris asking for his resignation despite instruction s from the CEO not to send the email. The Employee claimed that he "was upset and angry . . . [because] Dr. Norris was willfully disobeying my instructions and doing however he pleased . . ." The Employee claimed that he had no intention of firing Norris, but intended to impress upon Norris the seriousness of his conduct. Norris did not resign nor did the Employee fire him. The CEO dealt with the situation by immediately calling Norris and then following up a few days later when he returned to Knoxville from a business trip by meeting with both Norris and with the Employee. The Employee was told that his conduct was unacceptable and such a thing must never happen again. The CEO testified at trial that the conflict with Norris that resulted from the email hurt the company because it affected morale and took his, the CEO's, time and attention that could have been devoted to other matters. Also, according to the CEO, it distracted Norris for a time. To the best of the CEO's recollection, as refreshed by emails in that time frame, the purported firing of Norris happened on Thursday and was dealt with by the CEO on his first day back in the office, likely on Monday. Norris testified that he was worried about his job and was unproductive for several days because, among other things, he was looking for employment elsewhere. Norris and the Employee were able to work together after the incident, but not without some residual effect.

The third stated reason for terminating the Employee concerned a presentation he made to a small group of scientist during an informal conference in Asilomar, California ("the Conference"). The date of the Conference was September 16, 2007, four days before the Employee was orally fired.

The Employee was told it was to be a "collegial" presentation. The Company considered the Conference to be an important opportunity to present its new product line to persons in the academic and scientific communities who might be potential customers, collaborators, or investors. On August 24, 2007, the CEO instructed the Employee to complete a draft of the PowerPoint presentation by August 31, 2007. The Employee was also informed that the presentation was not to exceed 20 minutes in duration. This is documented by team-leader meeting notes. The time limitation was because the marketing director for the Company had persuaded the coordinator of the Conference, Mr. Sharone, to yield 20 minutes of his time as a favor to her, *i.e.*, the marketing director, and the Company. The Employee did not have a draft of the presentation ready by August 31, 2007; however, he testified that he did submit an "outline" of the presentation to the CEO on August 28 – one

that the CEO approved with little comment. An email in the record corroborates that the CEO approved the outline and that the outline allowed the CEO to make constructive comments concerning the presentation.

By email dated September 7, 2007, the CEO instructed the Employee to submit a draft of his presentation by September 10, to have it ready for "dry-runs" by September 11, and to submit a final copy to the coordinator of the Conference. The Employee did not submit his draft to the CEO until September 11, 2007, the morning after the deadline. The CEO provided no feedback until a dinner meeting on September 15, 2007, the evening before the Conference. The CEO required substantial revisions. The CEO gave the Employee his revised draft of the PowerPoint presentation on the morning of the Conference. The Employee proceeded through the "dry-runs" and made the presentation. It was not provided to the Conference coordinator before the Conference began.

The CEO and the marketing director were both present at the Conference and witnessed the presentation. They characterized the presentation, respectively, as "horrible" and "a disaster." Collectively, they had the same three primary criticisms of the presentation as asserted in the Employer's answers to interrogatories, namely, "[the Employee] substantially exceeded his allotted time, misrepresented [the Employer's] technology, and engaged in a verbal confrontation with a seminar participant."

The CEO and the marketing director stated that they "timed" the presentation with a watch, and it, not counting a protracted and contentious question and answer session that followed, exceeded the time by at least 10 minutes. The Employee claimed that he looked at his watch before the presentation began and after the question and answer session ended, and, based on that total, the presentation, not counting the question and answer session that the Conference coordinator allowed, could not have exceeded 20 minutes. The Employee testified that he was not given any indication by the Conference personnel that the presentation was taking to long or that he needed to wrap it up or get off the stage. The CEO admitted that he did not see any indication that anyone in charge of the Conference tried to stop or shorten the presentation. It is undisputed that the Conference coordinator allowed a question and answer session on the heels of the presentation.

With regard to the substance of the presentation, the CEO admitted that he did not really believe the Employee intentionally misrepresented anything. At another point in his testimony, he spoke in terms of the Employee doing a poor job in explaining the Passport System. The Employee testified that the presentation was "pretty good" but not his "best talk ever." One of the Employee's failings in this regard, according to the CEO and the marketing director, was that he apologized to the audience for "data we didn't have." According to the Employee, the CEO was to have supplied certain "small molecule data"

from an outside lab for incorporation into the presentation. The CEO admitted that was the original plan, but testified that the outside lab was unable to deliver the data on time and that there was plenty of data in house to make the presentation with no apologies. The Employee testified that the absence of the small molecule data and the late revisions rendered the presentation a little "rougher" than it would otherwise have been. Despite her criticisms of the presentation, the marketing director testified that it started out "as a solid B." When asked in her deposition about the problems with the presentation, she testified that the "worst" thing about it was that it exceeded the time slot. At trial, she first denied making the statement. When confronted with the deposition at trial, she admitted making the statement but changed her testimony to say that the worst thing about the presentation was a dispute between the Employee and an attendee that arose during the question and answer session.

This dispute between the Employee and an individual named Drew Sauter is the third criticism offered by the Employer of the presentation. Sauter owns a company that supplies laboratory equipment. During the question and answer session that followed the presentation, Sauter asked the Employee how the Company prepared its specimens for analysis. A short, non-controversial, way to answer the question would have been to respond, "by hand." The Employee, however, perceived the question to be an obvious attempt by Sauter to "plug" his own company and its services. During his cross-examination, the CEO admitted that it seemed to him that Sauter was simply making a "plug" for his services. Rather than open the door to allow Sauter to advertise his service as an alternative to "hand" preparation of samples, the Employee advised the audience of Mr. Sauter's identity and stated that he had tried to obtain some of Mr. Sauter's equipment but Sauter had been unable to supply it. Sauter protested, accusing the Employee of being untruthful and insulting. The verbal dispute escalated to the point that those in charge of the Conference told the Employee and Sauter to "take this up later" and moved on to another presentation after taking one more question from the audience. Although he stopped short of characterizing the Sauter exhange as a "freak coincidence," the CEO stated that he had never seen anything like it before or since.

The Employee testified that as a result of the Conference he had several positive inquiries from potential customers and collaborators and that when he was fired he directed these people to the CEO. The CEO admitted receiving an email from the Employee listing persons who had made inquiries, but claimed that the Company already had a relationship with two of the sources, and that the third was non-productive. However, the CEO admitted that he could not identify one single potential customer who had stated it would not do business with the Company because of the Employee's presentation at the Conference, nor could he identify "any lost sale of any product." In fact, the CEO admitted that "it is speculative" to say that "a material adverse effect . . . arose out of [the Conference]," but tempered his admission by asserting also, "I think it's a reasonable conclusion." The

marketing director for the Company also admitted under cross-examination that she could not identify any person who had said they would not do business with the Company because of what happened at the Conference.

The parties stipulated that the Employee's actions "did not result in a verifiable financial effect on the business of [the Employer] that is or could have been documented by sales records, profit and loss statements, expense reports, or other financial or sales records." The Employer took the position at trial that the stipulation did not mean that there was not a financial effect. The Employer claimed that the Employee's actions cast the Employer in a bad light in the eyes of potential customers and investors and delayed launch of the product. The Employer admitted, primarily through the testimony of its CEO, that there were many other causes of delay, as is typical of a "high-tech startup" company. Sources of delay that were not attributable to the Employee included software, engineering, and supplier sources. At the time the Employee was terminated, the formal launch of the product was a year or slightly more behind target.

The Employee's position at trial was that, although the Company had the absolute right to fire him, it was contractually obligated to provide the severance benefits if the Employer did not "effect" a Termination For Cause. The Employee argued that the Employer got angry when the presentation went awry and made up pretextual reasons to try to make it qualify as a Termination For Cause. The Employee offered powerful proof of his assertion in the form of an email exchange between the Employee and the CEO after the fact of the protocol dispute and the incident with Norris. In an email to the CEO dated August 11, 2007, the Employee stated: "I can assure you that I have no intention of leaving [the Company before the Passport System] is commercially successful, unless you ask me to." The CEO responded, "Thank you for the email – it does help to clear some things up. And, I have desire whatsoever to ask you to leave!"

A related position that the Employee asserted strongly at trial was that the value to him of the specificity required by the Agreement to "effect" a "Termination For Cause" was to protect against later-manufactured pretextual reasons. Counsel for the Employee cross-examined the CEO with the termination letter. At first, the CEO maintained that the "document encompassed all of these reasons." However, when asked "where it says anything about Dr. Norris specifically, the cartridge manufacturing protocol specifically or the . . . [C]onference specifically," the CEO answered, "It does not use those words."

B.

At the conclusion of the trial the court made the following findings which it incorporated into its judgment:

It seems uncontradicted that [the Employee] did, in contravention of a direct order not to do so, demand the resignation of Dr. Norris, when Dr. Norris was not [acting] in a manner that [the Employee] approved of.

[The Employee] had notified the present CEO of the [C]ompany that he intended to take this action. He was directly told by the CEO not to take that action and he did so anyway, and [the Employee] admits this to be the case and admits that this judgment was probably an error . . . .

There was quite a bit of talk about [the Employee's] failure to sign a cartridge manufacturing protocol. The court does not find that this was a material violation. In this particular case, the court believes that [the Employee] and the present CEO had a legitimate misunderstanding about the purpose of the protocol and that . . . by his own admission, the present C[E]O, Mr. Witkowski, had the authority to force the protocol on his own.

So the court does not find [the Employee's] failure to sign the protocol materially affected the [C]ompany. But the . . . [C]onference it seems clear as well that [the Employee] was given certain deadlines to meet for the drafting and the practicing of the presentation he made.

The court finds these deadlines were reasonable and rational. The court finds that this [C]onference was a vital importance to the [C]ompany, to the board, to the present CEO, to the marketing department with the [C]ompany, and that the requirements that the presentation be thoroughly prepared and practiced was . . . reasonable and rational and that [the Employee] failed to meet the . . . repeated deadlines that were set for the preparation of this.

And further . . ., the court finds that the preponderance of the evidence indicates that the presentation went over the 20 minutes that was an . . . important time limit that was placed upon the [C]ompany and that the altercation that arose because of [the Employee's ] choice as to how to [field] the question

-10-

from a member of the audience also undercut the value of the presentation.

In these respects, . . .with regards to his actions regarding Dr. Norris and his actions regarding [] the . . . [C]onference, the court does find that [the Employee], in the terms used by the employment contract, failed to follow reasonable unambiguous written procedures, directives, or policies of the [C]ompany. . . .

. . . . [T]he [Employee] protest[s] that even if he . . . had not acted in a proper fashion regarding these matters, that it did not cause any effect to the [C]ompany.

*   *   *

The [Employee] argues that [the stipulation that the Company cannot prove a verifiable financial effect on the business through financial records] means that the [Company] is unable to show that the actions of [the Employee] had a material and adverse effect on the [C]ompany's business. The court finds itself in disagreement with that position.

It seems clear to the court, at least the preponderance of the evidence indicates, that the actions of [the Employee] with regard to the Dr. Norris incident caused some degree of delay in the development of the product . . . and that this company . . . suffered financial losses every time the product was delayed.

Also, the actions of [the Employee] with regard to Dr. Norris, the preponderance of the evidence indicates it caused morale problems in this very small and close-[k]nit [C]ompany. And that again has been persuasively shown to the court to cause delay . . .

Secondly, the actions of the . . . [C]onference by . . . shining a negative light on the [C]ompany at a critical time in it's [sic] development in effect impacted the real or potential business goodwill of [the Company].

Tennessee recognizes that business goodwill is a property right. It is compensable when it is damaged and the court is persuaded by a preponderance of the evidence that the actions of [the Employee] and the substandard performance at the . . . [C]onference more likely than not negatively impacted the business goodwill of [the Company] and that such an impact, the court finds, does constitute a material adverse effect upon the business of [the Company].

A third issue that has been raised is the question of the notice that was provided to [the Employee] . . . . The [Employee] argues persuasively that the notice that was given to him – the written notice was insufficient under [the Agreement].

However, the . . . court finds that the notice was deficient only in failing to set forth the specific facts that constituted the reason for the termination. If this contract allowed for an administrative appeal of some sort . . . , the court would find that that was a critical failure on the part of the [C]ompany because the . . . [Employee] . . . would not have had sufficient notice to affect his appeal.

But this contract does not provide for any kind of appeal from the decision of the board to terminate. The court has looked at the question of substantial performance, which is the [Company's] argument in this case. . . .

In this particular case, it seems apparent to the court that the . . . [C]ompany had cause for the termination of [the Employee], provided him with notice both oral and written and [the Employee] was not, in any way the court can determine, prejudiced by the failure of the written notice to set forth the specific causes.

. . . . This litigation commenced shortly after the termination and we have been talking since December of 2007 about essentially the same three suggestions of the reasons for his termination. . . .

So the court does not believe that the [Employee] has been prejudiced by the failure of the written notice to set forth the

-12-

direct facts and that allowing him a recovery of effectively a quarter of a million dollars because of a technical deficiency in the written notice would be inconsonant.

And . . . therefore the court finds that the notice that was given does constitute substantial performance of the [notice] requirements in [the Agreement] . . . .

However, the court does find that the termination of the [Employee] was not effective until the written notice was received and therefore the [Employee] is entitled to pay for the period up to the date of receipt of the written notice of his termination.

Pursuant to its findings, the court entered a judgment that the termination qualified as a Termination For Cause and the Employee was not entitled under the Agreement to the severance benefits reserved for a Termination Without Cause. The Employee filed this timely appeal.

II.

The issues, as stated by the Employee, are:

Whether the trial court's ruling that [the Employee's] contract was terminated for cause was supported by a preponderance of the evidence and correct as a matter of law.

Whether the trial court correctly excused [the Employer's] failure to comply with the notice provision of the [Agreement].

III.

Since this case was tried by the court without a jury, we review the trial court's findings of fact *de novo*, with the presumption that they are correct unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d). Interpretation of a written contract is a matter of law, therefore,

our review is *de novo* on the record with no presumption of correctness in the trial court's conclusions of law.

\* \* \*

> The cardinal rule in the construction of contracts is to ascertain the intent of the parties. If the contract is plain and unambiguous, the meaning thereof is a question of law, and it is the Court's function to interpret the contract as written according to its plain terms. The language used in a contract must be taken and understood in its plain, ordinary, and popular sense. In construing contracts, the words expressing the parties' intentions should be given the usual, natural, and ordinary meaning. If the language of a written instrument is unambiguous, the Court must interpret it as written rather than according to the unexpressed intention of one of the parties. Courts cannot make contracts for parties but can only enforce the contract which the parties themselves have made.

*Honeycutt v. Honeycutt*, 152 S.W.3d 556, 561-62 (Tenn. Ct. App. 2003) (citations and internal quotation marks omitted).

As the Supreme Court explained in *Ellis v. Pauline S. Sprouse Residuary Trust*, 280 S.W.3d 806, 814 (Tenn. 2009):

> Contract law in Tennessee plainly reflects the public policy allowing competent parties to strike their own bargains. Tennessee's courts are not at liberty to make a new contract for parties who have spoken for themselves. Accordingly, the courts do not concern themselves with the wisdom or folly of a contract, and will not relieve a party of its contractual obligations simply because the contract later proves to be burdensome or unwise.
>
> When the parties have reduced their agreement to writing, the law favors enforcing these contracts as written. In the absence of fraud, mistake, or other supervening legal reason, the courts should construe unambiguous written contracts as they find them.

*Id*. (citations and internal quotation marks omitted).

-14-

IV.

The Employee correctly points out that we are not dealing here with a generic employment contract. The Agreement is very specific in distinguishing between a Termination Without Cause and a Termination For Cause. The Employer can "effect" a Termination For Cause for certain reasons and in a certain manner. The Employee also correctly points out that neither party is arguing that the language in the Agreement is ambiguous, therefore, it is our job to interpret and apply the language the parties have chosen and not to make a new contract for the parties. *Id*.

The trial court found that the Employee's failure to sign the manufacturing protocol did not constitute a basis for Termination for cause because it was (1) based on an honest misunderstanding and (2) did not have any adverse effect on the Company because the CEO could have decreed the working protocol to be the protocol. The Employer notes its disagreement with the finding, but offers no argument to challenge it. Therefore, we will move to the findings that are being challenged.

The Employee argues with regard to both the Norris email and the presentation, that they neither involve the "failure to follow reasonable, unambiguous, written . . . directives" nor constitute "serious acts or omissions . . . that adversely affect the Company's business in a material respect." The Agreement requires both. We will take them one at a time for each situation.

The evidence does not preponderate against the finding that the Employee failed to follow the CEO's unambiguous written directive[2] to not ask for Norris'es resignation. The evidence could not be much clearer on this point. The CEO told the Employee not to send Norris an ultimatum asking for his resignation or else, and the Employee did that very thing. He even admitted in his testimony that he made a mistake and went "too far."

With regard to the requirement that the act or omission "adversely affect the Company's business in a material respect," we conclude that, on the "Norris" issue, the evidence does preponderate against the trial court's findings. The trial court based its finding of an adverse effect on the delay caused by the disturbance of Dr. Norris's work and the disturbance of morale. It would be reasonable to conclude from this record that there was some "adverse" impact from the Employee's ultimatum to Norris, but the record does not suggest that the impact was material. The preponderance of the evidence is that Norris's work was disturbed only from Thursday of one week to Monday of the next when the CEO

---

[2]The Employee does not argue that emails from the CEO do not qualify as a written company directive.

came in and met with both Norris and the Employee. The Employee was told that his conduct was unacceptable and must never happen again and it did not happen again. The quarreling employees worked together after that, but there was understandably some residual effect. The impact on the Company was not "serious" enough or "material" enough to keep the CEO from telling the Employee, emphatically, after the Norris ultimatum, "I have no desire whatsoever to ask you to leave!" We hold that the trial court erred in finding that the Norris ultimatum had a material adverse effect on the Company's business so as to constitute a basis for Termination For Cause.

Our analysis is much the same concerning the Conference. The evidence does not preponderate against the trial court's finding that the Employee failed to follow directives with regard to deadlines for drafts of the presentation. The testimony is clear that the Employee missed deadlines. The testimony is not so clear that the 20 minute time limit or the "collegial" manner of presentation constituted a written directive. The reference to "collegial" was made in an informative email from the director of marketing to the Employee and the CEO informing them that the Company was on the agenda to make a presentation. Among other things, the email stated: "It is very informal – with a focus on 'sharing cutting edge research in a collegial manner.' Dean – keep this in mind when preparing your presentation." The word "directive," in its common usages, means "[a]n order or instruction." Webster's II, New Riverside University Dictionary, 381 (Anne H. Soukhanov ed. 1994). There are also several references to a 20-minute presentation, and documentation in meeting notes that the talk "cannot" exceed the allotted time, but nothing that would be normally be interpreted as a direct written order from a superior. Accordingly, we are persuaded that the evidence preponderates against the finding that, to the extent the presentation exceeded 20 minutes or was less than collegial, such was contrary to clear, unambiguous directives.

On a related note, we agree with the Employee that even if his exchange with Sauter was unwise or maybe even incompetent, it did not satisfy the Agreement's definition of Termination For Cause unless it was the result of the failure to follow an unambiguous directive. There is no evidence before us demonstrating or even suggesting that the Sauter problem was something that should have been anticipated. The only link of the Sauter problem to a "directive" that the Company offered and the trial court accepted was the reference to the nature of the Conference being "collegial" in a email from the marketing director. There is no suggestion in this record that the Employee, as head of research and development, responded to the marketing director. This, we believe is too tenuous a link to a Termination For Cause as defined in the Agreement.

We have accepted that the Employee's failure to meet deadlines with regard to the presentation constitutes a failure to follow directives. Even though we have concluded

otherwise with regard to the 20-minute time slot and the need to make a collegial presentation, we will assume for the sake of analysis now that they are also directives that were not followed. We nevertheless conclude that the evidence preponderates against finding any causal connection between the failure to follow those directives and any material adverse affect on the Company. The Employee's testimony that he was not called down or waived off the stage for exceeding the time allotted went undisputed. The same is true for the Employee's testimony that he went as the first presenter and the coordinator of the event then invited questions of him from the audience. The obvious implication is that the question and answer session would have been eliminated or cut short if time had been a problem.

We can readily accept that the dispute with Sauter and the failure to meet deadlines probably made the presentation less than ideal. We do not believe that they have been shown to be so serious that they adversely affected the Company in a material way. The Company's marketing director testified in her deposition that the "worst" thing about the presentation was its lengthy duration. She changed that testimony at trial to say that the argument with Sauter was the worst part of the presentation, but the wavering from one thing to another, neither of which focuses on the substance of the presentation, calls into question whether the substance of the presentation was as far off the mark as the Company's witnesses stated in their subjective opinion. With regard to the substance, the marketing director also testified that the presentation started out as a "solid B." We should also note, before moving on in our discussion, that everyone seems to agree that the Sauter dispute is not something the Employee should have seen coming.

Even if (1) the substance of the presentation was substantially below standard, (2) the Sauter dispute should have been avoided, and (3) the presentation exceeded the allowable time, we would nevertheless conclude that these failures did not "adversely affect the Company's business in a material respect." Neither the CEO nor the marketing director could point to one lost customer, collaborator, or sale. The CEO had to admit that "it is speculative" to say that "a material adverse effect . . . arose out of [the Conference]." Although we do not agree with the Employee that the stipulation that no financial effects can be shown through financial records is dispositive of the issue of material adverse effect, we do believe it is probative of the lack of material effect. What is also probative of a lack of material effect is the fact that six months after the Employee's termination the Company was able to launch the commercial production and sale of the Passport System and secure additional venture capital of up to $10,000,000. Accordingly, we hold that the evidence preponderates against the trial court's finding the Company sustained a material adverse effect from any failings in the presentation that flow from the failure to follow written directives.

The Employee also argues that the trial court erred in finding that the Company substantially complied with the notice requirements of the Agreement. We agree with the substance of the argument although we do not necessarily accept it *in toto*. The Agreement specifies both the circumstances and steps that allow the Employer to "effect" a Termination For Cause. We have dealt with the circumstances at length. Now, we are concerned with the steps. The Agreement requires (1) written notice, (2) identification of "the specific clause in the definition of 'Termination for Cause' relied upon by the Company" and (3) identification of the "facts and circumstances claimed by the Company to provide a basis for termination." The trial court specifically found that written notice was required and that the termination was not effective as a "Termination for Cause" until the written notice was given. It further found that the written notice was deficient in that it did not identify the factual circumstances that constituted failure to follow written directives. Nevertheless, the court gave the defective written notice effect as a Termination for Cause because it saw the result of giving the Employee a substantial severance package as unjust. We have previously held that "[w]hat appears to be fair as a matter of equity cannot prevail in the face of . . . contractual provisions governing the rights of the parties." ***ARC LifeMed, Inc. v. Amc Tennessee, Inc.***, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005). The trial court's holding is contrary to the explicit language of the Agreement, and violates the directive in ***Ellis*** that courts must not "relieve a party of its contractual obligations simply because the contract later proves to be burdensome or unwise." 280 S.W.3d at 814. These parties have "spoken for themselves." ***Id***. By the words they have spoken, if the Company does not have the grounds or take the steps required to "effect a Termination For Cause," then the termination is treated as a "Termination Without Cause." We hold that the notice given the Employee did not "effect" a Termination For Cause.

V.

In summary, it is essential that one understands what this case is about and what it is not about. This is *not* a contest to determine whether the Employee has been a good employee in some general sense. If it were such a case, perhaps – and we stress the word *perhaps* – one could find that the Employee had performed his duties in a way that was not satisfactory; but satisfactory performance is not the issue before us. On the contrary, what we are dealing with in this case is something very different, *i.e.*, whether the Employee was Terminated For Cause pursuant to a specifically-worded contract. In our judgment, the evidence preponderates in favor of a finding that his termination did not constitute a Termination For Cause as defined in the Agreement.

VI.

The judgment of the trial court is reversed. Costs on appeal are taxed to the appellee, Protein Discovery, Inc. This case is remanded, pursuant to applicable law, for further proceedings not inconsistent with this opinion.


_____
CHARLES D. SUSANO, JR., JUDGE