IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
February 15, 2012 Session

## R. DOUGLAS HUGHES ET AL. V. NEW LIFE DEVELOPMENT CORPORATION ET AL.

**Appeal by Permission from the Court of Appeals, Middle Section**
**Chancery Court for Franklin County**
**Nos. 18,444 & 18,956      Thomas W. Graham, Judge**

---

**No. M2010-00579-SC-R11-CV - Filed November 19, 2012**

---

This appeal involves the validity and effect of amendments to restrictive covenants for a residential development and amendments to the charter and bylaws for the homeowners' association serving the development.  After the death of the president of the original corporate developer, a successor developer purchased the original developer's remaining property with the intent to continue to develop the property.  Several homeowners filed suit in the Chancery Court for Franklin County, alleging that the successor developer's new development plan violated restrictive covenants.  The trial court granted the successor developer a judgment on the pleadings, and the homeowners appealed.  The Court of Appeals remanded the case for further proceedings, principally on the question of whether a general plan of development, or the plat for the subdivision, gave rise to certain implied restrictive covenants.  *Hughes v. New Life Dev. Corp.*, No. M2008-00290-COA-R3-CV, 2009 WL 400635, at *9-10 (Tenn. Ct. App. Feb. 17, 2009).  While the successor developer's application for permission to appeal was pending, the homeowners' association amended its charter and the restrictive covenants to address certain issues identified by the Court of Appeals.  Thereafter, the homeowners filed a second suit, principally contesting the validity of the amendments.  The trial court consolidated the two suits and granted the successor developer a summary judgment on all claims in both suits.  However, the trial court also enjoined the successor developer from acting contrary to its corporate charter.  The homeowners appealed a second time. On this occasion, the Court of Appeals concluded that the procedure used to amend the charter and restrictive covenants was valid but remanded the case with directions to determine whether these amendments were reasonable and to determine whether the plat supported the existence of implied restrictive covenants. *Hughes v. New Life Dev. Corp.*, No. M2010-00579-COA-R3-CV, 2011 WL 1661605, at *9-11 (Tenn. Ct. App. Apr. 29, 2011).  The successor developer filed an application for permission to appeal, asserting that Tennessee law did not support the Court of Appeals' reasonableness inquiry and that the plat provided no basis for the existence of implied restrictive covenants.

We have determined that the amendments were properly adopted and that there is no basis for implied restrictive covenants arising from a general plan of development or from the plat.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Affirmed in Part and Reversed in Part**

WILLIAM C. KOCH, JR., J., delivered the opinion of the Court, in which GARY R. WADE, C.J., JANICE M. HOLDER, CORNELIA A. CLARK, and SHARON G. LEE, JJ., joined.

Joseph A. Woodruff and Alyssa M. Leffall, Nashville, Tennessee; and Douglas S. Hale, Franklin, Tennessee, for the appellants, New Life Development Corp., Robby McGee, Jeffrey M. Dunkle, and B.J. Cline.

Frederick L. Hitchcock and Willa B. Kalaidjian, Chattanooga, Tennessee, for the appellees, R. Douglas Hughes, M. Lynne Hughes, Louise Hubbs, and Guy Hubbs.

John P. Williams, Nashville, Tennessee, for the Amicus Curiae, The Home Builders Association of Middle Tennessee.

## OPINION[1]

### I.

This is a case involving two families who purchased lots in a new subdivision that advertised permanent access to a set of dedicated wilderness preserves on the property surrounding their homesites. After the land was sold to a new developer, that developer began making plans to convert that land to a golf course and dozens of additional home sites. The homeowners sued to protect the wilderness preserves, hoping that the courts would enforce what the homeowners believed was a restrictive covenant on the land.

Cooley's Rift[2] is a private residential development near Monteagle, Tennessee. The original developer of Cooley's Rift was Raoul Land and Development Company ("Raoul

---

[1]Some of the facts contained in this opinion have been gleaned from prior proceedings in this case. Because we are permitted to take judicial notice of the facts from earlier proceedings in the same action, *State v. Lawson*, 291 S.W.3d 864, 869-70 (Tenn. 2009), we have included facts from the earlier proceedings in order to provide a clearer understanding of the issues in this appeal.

[2]Cooley's Rift is alternately referred to, even in recorded instruments, as Cooley's Rift, Cooley's Rift Mountain Preserve, and Cooley's Rift Preserve. We will refer to the development as Cooley's Rift.

Land Development"). On November 6, 2002, Raoul Land Development recorded a plat ("the 2002 plat") for Cooley's Rift Subdivision Phase I that showed twenty-four delineated lots, roads accessing the lots, a lake bordering some of the lots, and a surrounding area of land.

Days later, Raoul Land Development recorded a Declaration of Covenants and Restrictions ("the Declaration") for Cooley's Rift. The Declaration stated in its introduction that Raoul Land Development would cause to be incorporated the Cooley's Rift Homeowners' Association ("the Association") to exercise certain functions set out in the Declaration. The Declaration also specifically referenced bylaws ("the Bylaws") for the Association, indicating that the initial text of the Bylaws was attached to and made a part of the Declaration.[3] In December 2002, the Association was incorporated and its charter ("the Charter") filed in accordance with the Tennessee Nonprofit Corporation Act, Tenn. Code Ann. §§ 48-51-101 to 48-68-105 (2002 & Supp. 2011).

Douglas and Lynne Hughes purchased a lot in Cooley's Rift from Raoul Land Development, as did Guy and Louise Hubbs (collectively "the Homeowners"). According to the Homeowners, promotional materials for the development indicated that Cooley's Rift, which comprised approximately 1,450 acres of land, would have only eighty homesites, up to eight acres in size each, and would have nearly 1,000 acres preserved in perpetuity.[4] The promotional materials, however, also indicated that the design concept was preliminary in nature and was subject to change by the developer without notice.

Raoul Land Development did not complete the Cooley's Rift development. Although the record does not specifically address the reason, the parties have indicated that the one-time president of Raoul Land Development, Gaston C. Raoul, III, passed away. Regardless, on September 6, 2005, Raoul Land Development conveyed to New Life Development

---

[3]Although the Declaration states that the initial text of the Bylaws is attached to the Declaration as Exhibit B, the copies of the Declaration included in the record do not have an attached Exhibit B. It is unknown whether the initial text of the Bylaws was, in fact, attached as Exhibit B to the Declaration.

[4]We glean these facts from the opinion of the Court of Appeals, *Hughes v. New Life Dev. Corp.*, No. M2008-00290-COA-R3-CV, 2009 WL 400635, at *1 (Tenn. Ct. App. Feb. 17, 2009), *reh'g denied* (Tenn. Ct. App. Mar. 9, 2009), *perm. app. denied* (Tenn. June 16, 2009) ("*Hughes I*"). The parties have referred to exhibits attached to the Homeowners' first complaint that apparently included certain promotional materials. The first complaint and its exhibits, however, are not included in the record in this appeal. Instead, the record for this appeal begins with the opinion and mandate from the Court of Appeals and continues with the proceedings upon remand. As such, this Court is left without a copy of the filing that began these proceedings. Needless to say, appellants have a duty to prepare a record that conveys a fair, accurate, and complete account of what transpired in the trial court in order to allow meaningful review on appeal. *Jennings v. Sewell-Allen Piggly Wiggly*, 173 S.W.3d 710, 713 (Tenn. 2005); *Jones v. LeMoyne-Owen Coll.*, 308 S.W.3d 894, 902 (Tenn. Ct. App. 2009); *see also* Tenn. R. App. P. 24(a).

Corporation[5] ("New Life") eleven unimproved lots in the subdivision and approximately 1,400 acres of undeveloped land surrounding the platted lots. The special warranty deed contains a lengthy metes and bounds description of a tract of land approximately 1,532 acres in size. The deed indicates that this tract includes the twenty-four lots shown on the 2002 plat, but the deed specifically excludes thirteen of the lots as having been previously conveyed by Raoul Land Development. The deed provides that the conveyance is subject to various provisions, conditions, encroachments, and easements, specifically including the restrictions in the recorded Declaration. The deed also specifically references the 2002 plat.

New Life eventually undertook to continue development of the real property it had purchased from Raoul Land Development. On June 24, 2006, New Life convened a special meeting of the Association. Present at the meeting were representatives of New Life, which owned eleven platted lots and surrounding acreage, and the owners of nine of the remaining thirteen platted lots. At this meeting, New Life presented a conceptual development plan, subject to change, that depicted an eighteen-hole golf course and approximately 650 homesites.[6]

On April 16, 2007, the Homeowners filed suit against New Life in the Chancery Court for Franklin County. They alleged that New Life had announced an intention to develop its property in ways that violated the Declaration and the general plan created by Raoul Land Development. The suit was designated as Case No. 18,444. The Homeowners alleged that, in purchasing their lots, they had reasonably relied upon the representations of Raoul Land Development that Cooley's Rift would be developed in accordance with its general plan. Specifically, according to the Homeowners, this general plan contained two forest preserves that were to remain undeveloped: an East Preserve and a West Preserve. The Homeowners further alleged that New Life took title subject to the plan. The Homeowners' complaint contained seven counts as follows:

    (1)    an action for enforcement of three express restrictions of the Restrictive Covenants;

---

[5]The style of the case and most references in the record identify this entity as New Life Development Corporation or New Life Development Corp. However, the entity is identified at times as New Life Development, Inc. It appears that the correct corporate name is, in fact, New Life Development, Inc.

[6]According to New Life, its conceptual plan has changed since that time. The record contains a 2008 plan. It is difficult to discern the details of development in the 2008 plan because of the size limitations of the page. The 2008 plan does appear to show an eighteen-hole golf course and well in excess of eighty homesites. In its brief, New Life indicates that the 2008 plan has since been modified, but the details are not included in the record.

(2)     a derivative action on behalf of the Homeowners Association to enforce the express covenants;

(3)     a derivative action for an injunction quia timet "to prevent New Life from altering or destroying any of the Amenities and Preserves;"

(4)     a derivative action for specific enforcement of "the transfer of title to the Amenities and Preserves to the Homeowners Association, as required by the Restrictive Covenants;"

(5)     an alternative derivative action for a constructive trust to protect the Homeowners Association's rights in the Amenities and Preserves;

(6)     action for enforcement of Cooley's Rift development plan created by [Raoul Land Development] and "enforceable by the Plaintiffs as implied covenants that are binding upon New Life as the successor to the Raoul [Land Development] Company with the knowledge of the Cooley's Rift Plan;" and

(7)     a direct action to impose a constructive trust.

*Hughes I*, 2009 WL 400635, at *2.[7]  On April 25, 2007, New Life filed an answer and a motion for judgment on the pleadings or, in the alternative, for a summary judgment.

The trial court granted New Life's motion for judgment on the pleadings.  The court found that the Declaration confined the covenants "to those lands that fall within the boundaries of the lots and roads as shown on the recorded plat." *Hughes I*, 2009 WL 400635, at *2.  Based on the language in the Declaration, the court also found that "there were no implied covenants applicable to New Life's unsubdivided property." *Hughes I*, 2009 WL 400635, at *2.

The Homeowners appealed to the Court of Appeals.  The Court of Appeals agreed with the trial court that the express terms of the Declaration limited the application of the covenants to the platted lots.  Thus, the Court of Appeals concluded that the Declaration did not support the Homeowners' argument that the covenants applied to all of New Life's property. *Hughes I*, 2009 WL 400635, at *4.  Therefore, the Court of Appeals concluded that

---

[7]Again, we glean these facts related to the Homeowners' complaint in Case No. 18,444 from the opinion of the Court of Appeals because the record in this appeal does not include the complaint and its accompanying exhibits.

the trial court had properly granted New Life a judgment on the pleadings with respect to claims seeking to extend application of the covenants beyond the platted lots. *Hughes I*, 2009 WL 400635, at *5. The court did note, however, that the covenants would apply to the extent New Life's development plan included its platted lots. *Hughes I*, 2009 WL 400635, at *5.

However, the Court of Appeals reversed the trial court's dismissal of the Homeowners' implied-restrictive-covenants claim applicable to the property outside the platted subdivision based on what it characterized as an ambiguity in the Declaration. Article 2.01 of the Declaration, which addresses "Properties, Common Properties and Improvements Thereon," states that the

> Developer intends to develop the Property[8] in accordance with its Master Plan, as subsequently modified from time to time, as a residential community featuring wilderness preserves with hiking and riding trails and other recreational facilities, multiple amenities and any other lawful activities which the Developer deems appropriate as uses for such property.

Article 2.01 also states that the Developer reserved the right to modify the Master Plan "at its sole option from time to time based upon its continuing research and design program." Likewise, the definition of Master Plan at Article 1.16 of the Declaration states that "the future development of the undeveloped portions of Cooley's Rift Preserve is subject to continuing revision and change at the discretion of the Developer." Article 1.16 continues as follows:

> In addition, no implied reciprocal covenants shall arise with respect to lands which have been retained by the Developer for future development except that all the covenants, restrictions, obligations and conditions set forth in this Declaration shall apply to all portions of the Property [as identified in Article 2.01] retained by the Developer. THIS DECLARATION DOES NOT DESIGNATE ANY PORTION OF THE PROPERTY FOR ANY PARTICULAR USE, SUCH DESIGNATION TO BE MADE BY SEPARATE SUBSEQUENT DECLARATION

---

[8]"Property" is described in Article 2.01 as the platted lots and any easements on any real property retained by or granted to the Developer or the Association for the purpose of erection and maintenance of entrance signs or street lights, landscaping and maintenance of Common Properties, landscaping and maintenance of recreational facilities, or for conservation purposes.

OR BY RECORDED PLAT WITH SUCH DESIGNATION CLEARLY AND UNEQUIVOCALLY SHOWN THEREON. THE DEVELOPER SHALL NOT BE BOUND BY ANY DEVELOPMENT PLAN, USE OR RESTRICTION OF USE SHOWN ON ANY MASTER PLAN, AND MAY AT ANY TIME CHANGE OR REVISE SAID MASTER PLAN AT DEVELOPER'S SOLE DISCRETION.

However, Article 2.01 also states, "The Master Plan shall not bind the Developer, its successors and assigns, to adhere to the Master Plan in the development of the land shown thereon *except as to the general location and approximate acreage of the Common Properties*[9]" (emphasis added). Article 2.01 continues, "*Other than as stated in* [Article 2.01], the Developer shall have full power to add to, subtract from or make changes in the Master Plan" (emphasis added).

The Court of Appeals found that this emphasized language created an ambiguity in the Declaration. It stated that "[o]n one hand, the Developer is entitled to revise the Master Plan at his discretion and the Declaration expressly disclaims any implied restrictive covenants. On the other hand, [Article 2.01] suggests that the Developer cannot revise the Master Plan to change the general concept concerning the Common Properties." *Hughes I*, 2009 WL 400635, at *8. The Court of Appeals readily acknowledged that the express disclaimer in the definition of Master Plan in Article 1.16 of the Declaration "casts serious doubt on Homeowners' argument that they reasonably relied upon assurances with respect to future development in those areas not expressly covered by the Restrictive Covenants." *Hughes I*, 2009 WL 400635, at *8. Nevertheless, the Court of Appeals concluded that because of the ambiguity, "the trial court erred in granting judgment on the pleadings with respect to the possible existence of implied restrictive covenants under the theory of a general plan of development." *Hughes I*, 2009 WL 400635, at *9.

The Court of Appeals also concluded that the Homeowners had alleged a claim for breach of implied restrictive covenants based upon the 2002 plat that was sufficient to survive judgment on the pleadings. In particular, the Homeowners alleged that the 2002 plat created twenty-seven lots, more specifically twenty-four homesites and three lots designated

---

[9]"Common Properties," in turn, are defined in Article 1.06 of the Declaration as "those tracts of land and any improvements thereon which are deeded or leased to the Association and designated in said deed or lease as 'Common Properties.'" Common Properties "may include but not be limited to streets, gatehouses, mailbox center, street lights, entrance and street signs, landscaping easement areas, playgrounds, ball fields, parks, hiking and/or riding trails, *wilderness preserve areas*, maintenance equipment and sheds, a Manager's house or quarters, barns, lodge, and boathouses" (emphasis added).

as forest preserves. They alleged that the 2002 plat contained labels for two of the forest preserves, the East Preserve and the West Preserve, and that New Life therefore acquired the land subject to the forest preserves. The Court of Appeals noted that it was unable to discern from the record whether the recorded plat actually designated any areas as forest preserves. Nonetheless, the Court of Appeals concluded that it was possible that the 2002 plat provided a basis for implied restrictions. *Hughes I*, 2009 WL 400635, at \*9 (citing *Stracener v. Bailey*, 737 S.W.2d 536, 539 (Tenn. Ct. App. 1986) (finding an implied restrictive covenant as to an area designated as a "park" on a plat)).

Based on its conclusions, the Court of Appeals remanded to the trial court for further proceedings to determine whether implied restrictive covenants arose from a general plan of development or from the 2002 plat. *Hughes I*, 2009 WL 400635, at \*9-10. New Life sought rehearing in the Court of Appeals, which the Court of Appeals denied on March 9, 2009. New Life then sought permission to appeal to this Court, which this Court denied on June 16, 2009.

While its application for permission to appeal was pending, New Life undertook to address the ambiguity in the Declaration that had been noted by the Court of Appeals. On May 26, 2009, the Association's board of directors ("the Board") issued a notice of a special meeting of the Association to consider proposed amendments to the Charter and the Declaration. Accompanying the notice was a letter from the President of the Association (also a member of the Board) which specifically referenced the ongoing litigation and stated that one of the purposes of the amendments was to address the ambiguity that had been pointed out by the Court of Appeals.

The special meeting of the Association took place on June 28, 2009. Mr. Hughes, on behalf of the Homeowners and one additional owner, objected to the meeting on the basis that the meeting had not been properly called. Thereafter, the amendments to the Charter and Declaration were adopted with nineteen of twenty-two votes in favor.

On August 11, 2009, the Homeowners filed another complaint in the Chancery Court for Franklin County. This suit was designated as Case No. 18,956. The named defendants were Robby McGee, Jeffrey M. Dunkle, and B.J. Cline. Mssrs. McGee, Dunkle, and Cline (collectively "the Individual Defendants") were all affiliated in some way with New Life, and they had been appointed by New Life as members of the Interim Board.[10] The principal

_____

[10]Article 5.02 of the Bylaws specifies that the rights, duties, and functions of the Board shall be solely exercised by the Developer until such time as the Developer in its sole discretion determines to call a special meeting of the Association to elect a Board to succeed the Developer. In the interim, the Developer

(continued...)

-8-

factual allegations in the complaint were as follows: (1) New Life was not the "Developer" of Cooley's Rift for purposes of the Charter and the Bylaws; (2) because New Life was not the "Developer," it did not have the authority to appoint members of the Interim Board; and (3) accordingly, the Individual Defendants did not have the authority to have called a special meeting of the Association to consider the amendments to the Charter and the Declaration. Based on these factual allegations, the Homeowners presented three claims for relief: (1) a claim for injunctive relief prohibiting the Individual Defendants from taking any action to enforce or apply any of the amendments to the Charter or the Declaration; (2) a derivative claim as a member of the Association seeking to enforce the covenants on behalf of the Association; and (3) a derivative claim for an injunction quia timet to prohibit the Individual Defendants from taking any action that would result in alteration or destruction of the "Amenities and Preserves."

The trial court consolidated the two cases. New Life filed a motion for a summary judgment as to Case No. 18,444, which the Homeowners opposed. Likewise, the Homeowners filed a motion for a summary judgment as to Case No. 18,956, which the Individual Defendants opposed.

The trial court filed a memorandum opinion and order and, later, a final judgment disposing of all claims in the two cases. Among the trial court's findings were the following: (1) New Life acquired all rights of Raoul Land Development, including the right to act as the "Developer" of Cooley's Rift; (2) the amendments to the Charter and the Declaration were validly adopted by the Association; (3) the amendments to the Declaration resolved any ambiguity in the Declaration that could serve as a basis for implied restrictive covenants arising from a general plan or scheme; (4) nothing on the 2002 plat created an implied restrictive covenant pertaining to forest preserves; and (5) the Homeowners lacked sufficient voting power to have standing to bring derivative claims. Based on its findings, the trial court dismissed all seven claims from Case No. 18,444 and all three claims from Case No. 18,956. The trial court did, however, enjoin New Life "from engaging in any development which would be a prohibited activity under Article VIII, Section (e) of its Charter."[11]

---

[10](...continued) may, in its sole discretion, designate up to five individuals to act as the Board on behalf of the Developer during the time period that the Developer is performing the functions of the Board. Such individuals need not be owners and may be removed and replaced by the Developer at will.

[11]Article VIII, Section (e) of New Life's charter authorized New Life to exercise all powers necessary or convenient to carrying out its purposes, provided "that the corporation shall not engage in any activity not permitted of an organization described in Section 501(c)(2) of the [Internal Revenue] Code."

The Homeowners again appealed to the Court of Appeals. The Court of Appeals rejected the Homeowners' challenge to the validity of the amendment process. *Hughes v. New Life Dev. Corp.*, No. M2010-00579-COA-R3-CV, 2011 WL 1661605, at *4-5 (Tenn. Ct. App. Jan. 20, 2011), *reh'g denied* (Tenn. Ct. App. May 23, 2011) ("*Hughes II*"). As a result, the Court of Appeals concluded that the trial court had properly dismissed the Homeowners' derivative claims. *Hughes II*, 2011 WL 1661605, at *5. However, rather than giving effect to the amendments, the Court of Appeals remanded the case to the trial court to determine whether the amendments were "reasonable." *Hughes II*, 2011 WL 1661605, at *5-9. Additionally, with respect to implied restrictive covenants arising from the 2002 plat, the Court of Appeals remanded for further proceedings to determine whether New Life knew or should have known what certain "blurry words on the plat said." *Hughes II*, 2011 WL 1661605, at *10. We granted New Life's application for permission to appeal to review the decision of the Court of Appeals.

## II.

Although this matter began in the Chancery Court for Franklin County in 2007 as an inquiry into the application of restrictive covenants, the sequence of events occurring after the Court of Appeals issued its first opinion raised an entirely new set of issues. Those issues revolve around amendments to the restrictive covenants. First and most fundamental among them is the validity of the amendment process itself. Thus, we will first examine the process by which the amendments were made.

In Case No. 18,956, the Homeowners challenged the validity of the amendments by assailing the amendment process. Central to the Homeowners' challenge was their contention that New Life was not the "Developer" for purposes of the Charter and the Bylaws. The Homeowners asserted that the authority and function of the Developer under the Charter and the Bylaws was, by the plain language of the instruments themselves, reserved solely to Raoul Land Development. They further asserted that New Life, in purchasing the Cooley's Rift property, did not acquire Raoul Land Development's rights and interests as the Developer under the Charter and the Bylaws. They pointed out that although Raoul Land Development could have amended the Charter and the Bylaws to reflect the changing circumstances prompted by the property sale to New Life, neither the Charter nor the Bylaws had been modified at the time of the sale.

Building upon this core contention, the Homeowners set forth a number of consequences that allegedly flowed from New Life's failure to become the Developer under the Charter and the Bylaws. Specifically, the Homeowners contended that under Article 10 of the Charter and Article 5.02(a) of the Bylaws, the rights, duties, and functions of the Board were to be exercised solely by the Developer until such time as the Developer calls for a

special meeting of the Association to elect a Board to succeed the Developer. Additionally, under Article 5.02(a) of the Bylaws, the Developer alone has the authority to designate members of the Interim Board during the time the Developer is performing the functions of the Board. Based on their assertion that New Life was not the Developer of the property, the Homeowners insisted (1) that the Individual Defendants were never properly appointed to the Interim Board because New Life lacked the authority to appoint them; (2) that the Individual Defendants did not have the authority to call the special meeting of the Association; (3) that the special meeting of the Association called by the Individual Defendants was not properly called; (4) that the initiation of the amendment process was fatally flawed; and (5) therefore, that the amendments to the Charter and the Declaration were ineffective.

The trial court found no merit to the Homeowners' contention that New Life was not the Developer of Cooley's Rift. In rejecting the Homeowners' argument, the trial court found significant the "very expansive habendum clause" in the deed conveying the interests of Raoul Land Development to New Life. The trial court concluded that Raoul Land Development conveyed all of its rights and interests in the property to New Life, including the right to function as the Developer and, under Article 5.02 of the Bylaws, to appoint an Interim Board. The Court of Appeals agreed, looking to the deed and other documents surrounding the property sale to conclude that Raoul Land Development transferred its rights and interests as the Developer to New Life. *Hughes II*, 2011 WL 1661605, at *4-5.

## A.

We begin our analysis by examining the entirety of the transaction between Raoul Land Development and New Life. The record contains two primary documents that comprise the transaction between Raoul Land Development and New Life, a Purchase and Sale Agreement and a deed. Together, these documents reflect the transfer of real property, as well as other items and interests from Raoul Land Development to New Life.

On July 5, 2005, Raoul Land Development and New Life executed a Purchase and Sale Agreement. The agreement referred to certain real property, identified through a lengthy metes and bounds description. Specifically included in the large tract comprising the described real property were the twenty-four platted lots of the subdivision, with thirteen of the twenty-four lots excepted as having been previously conveyed by Raoul Land Development to third parties.

However, the Purchase and Sale Agreement addressed more than just the real property. In particular, the Purchase and Sale Agreement indicated that Raoul Land Development "agrees to sell" and New Life "agrees to purchase" the real property, "together

with all easements, rights and privileges appurtenant thereto, all leases of the subject real property or any portion thereof with rental to be prorated thru the date of closing, the Work Product Documents hereinafter defined and the name 'Cooley's Rift' and all derivations thereof . . . ."

The Work Product Documents are attached as an exhibit to the Purchase and Sale Agreement. Among the listed items are several documents that are clearly related to development of the property. For example, the list contains references to: marketing literature; a work proposal and bid for construction of a community shelter; architectural designs for a "Manager's house, Gate House, Lodge, Entry Way, misc.;" a stocking plan for Lake Louisa; a stability analysis of and construction specifications for a dam; site plan sketches for Phase I of Cooley's Rift; a Franklin County zoning resolution; and Franklin County subdivision regulations. Also of particular significance are (1) an engineering document entitled "Proposed Water Distribution Plan, Cooley's Rift Mountain Preserve, *Phase II* (and related documentation)" (emphasis added), and (2) a document entitled "Regulatory Steps for Residential Subdivision Development."

Some two months later, on September 6, 2005, the deed conveying the real property from Raoul Land Development to New Life was signed by the grantor. Like the Purchase and Sale Agreement, the deed identifies the real property through a metes and bounds description. The deed goes on to identify the twenty-four platted lots of the subdivision as being within the tract conveyed, specifically excepting the thirteen lots that had already been conveyed to third parties by Raoul Land Development.

We first consider the Purchase and Sale Agreement. The Purchase and Sale Agreement is a contract, and we interpret it accordingly. *See Estate of Darnell v. Fenn*, 303 S.W.3d 269, 275-77 (Tenn. Ct. App. 2009); *Covington v. Robinson*, 723 S.W.2d 643, 645-46 (Tenn. Ct. App. 1986). Our central task in interpreting a contract is to ascertain and to give effect to the intent of the contracting parties. *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999); *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975). The search for the parties' intent should focus on the four corners of the contract, *Whitehaven Cmty. Baptist Church v. Holloway*, 973 S.W.2d 592, 596 (Tenn. 1998); *Hall v. Jeffers*, 767 S.W.2d 654, 657-58 (Tenn. Ct. App. 1988), the circumstances in which the contract was made, *Penske Truck Leasing Co. v. Huddleston*, 795 S.W.2d 669, 671 (Tenn. 1990); *Pinson & Assocs. Ins. Agency, Inc. v. Kreal*, 800 S.W.2d 486, 487 (Tenn. Ct. App. 1990), and the parties' actions in carrying out the contract, *Hamblen Cnty. v. City of Morristown*, 656 S.W.2d 331, 335 (Tenn. 1983); *Ballard v. North Am. Life & Cas. Co.*, 667 S.W.2d 79, 84 (Tenn. Ct. App. 1983). Contract interpretation is a matter of law and, therefore, is subject to de novo review in this Court. *Hamblen Cnty. v. City of Morristown*,

656 S.W.2d at 335-36; *Standard Fire Ins. Co. v. Chester O'Donley & Assocs.*, 972 S.W.2d 1, 5-6 (Tenn. Ct. App. 1998).

In our view, the language of the Purchase and Sale Agreement clearly evidences the parties' intent that New Life acquire Raoul Land Development's rights and interests as the "Developer" of Cooley's Rift. We need look no further than the Work Product Documents that were sold by virtue of the Purchase and Sale Agreement. These documents are obviously related to development activity, including both Phase I and a proposed Phase II of Cooley's Rift. The Work Product Documents even directly reference residential subdivision development. Additionally, the Purchase and Sale Agreement includes the sale of "the name 'Cooley's Rift' and all derivations thereof." These items are consistent with more than simply acquiring ownership of real property in Cooley's Rift. Instead, this language amply reflects the parties' mutual intent that New Life succeed to Raoul Land Development's position as the Developer.

Furthermore, the parties' actions in carrying out the Purchase and Sale Agreement buttress the conclusion that it was the intent of the parties that New Life acquire Raoul Land Development's rights and interests as the Developer. In this vein, we turn to consider the deed.

The record reflects that, not surprisingly, the actual conveyance of the real property occurred by execution of the deed approximately two months after the parties entered into the Purchase and Sale Agreement. "In Tennessee, as in other states, land conveyances generally occur in a two step process: execution of a land sale contract followed by execution and delivery of a deed." *In re Gee*, 166 B.R. 314, 317 (Bankr. M.D. Tenn. 1993). The language of the Purchase and Sale Agreement itself serves to recognize this principle in that it plainly anticipates later conveyance of the real property. For instance, the Purchase and Sale Agreement specifically provides with respect to the "Instrument of Conveyance" that "[f]ee simple title . . . shall be conveyed by [Raoul Land Development] by Special Warranty Deed" at a closing originally scheduled for September 5, 2005. Thus, in contrast to the Work Product Documents, the real property described in the Purchase and Sale Agreement was actually conveyed by execution of the deed so as to satisfy various statutory requirements. *See In re Gee*, 166 B.R. at 317; *see also* Tenn. Code Ann. § 66-5-103 (2004).

In evaluating the deed, we apply certain established principles. The interpretation of a deed is a question of law. *Griffis v. Davidson Cnty. Metro. Gov't*, 164 S.W.3d 267, 274 (Tenn. 2005); *Mitchell v. Chance*, 149 S.W.3d 40, 45 (Tenn. Ct. App. 2004). In interpreting a deed, courts are primarily concerned with ascertaining the intention of the grantor. *Griffis v. Davidson Cnty. Metro. Gov't*, 164 S.W.3d at 274; *Rutherford Cnty. v. Wilson*, 121 S.W.3d 591, 595 (Tenn. 2003); *Hall v. Hall*, 604 S.W.2d 851, 853 (Tenn. 1980). Courts ascertain

the grantor's intent from the words of the deed as a whole and from the surrounding circumstances. *Griffis v. Davidson Cnty. Metro. Gov't*, 164 S.W.3d at 274; *Ottinger v. Stooksbury*, 206 S.W.3d 73, 79 (Tenn. Ct. App. 2006); *Shew v. Bawgus*, 227 S.W.3d 569, 576 (Tenn. Ct. App. 2007); *Cellco P'ship v. Shelby Cnty.*, 172 S.W.3d 574, 586 (Tenn. Ct. App. 2005).

The deed in this case exhibits no different intent from the Purchase and Sale Agreement with respect to Raoul Land Development's transfer of its rights and interests as the Developer to New Life. The deed identifies the real property at issue and conveys it "with the appurtenances, estate, title and interest thereto."[12] Not surprisingly, the deed does not reference the Work Product Documents. At its core, a deed is simply "a written instrument by which land is conveyed." Black's Law Dictionary 475 (9th ed. 2009).

The Work Product Documents do not represent an estate or interest in land. In fact, the rights and interests of the Developer, as they are referred to in this case, ultimately concern rights of governance under the Association's Charter and Bylaws and do not represent an estate or interest in land. However, the deed does contain some limited language consistent with the transfer of rights and interests as the Developer evidenced by the Purchase and Sale Agreement. In particular, the deed references the Declaration, stating that New Life takes title to the real property subject to the Declaration. The Declaration, in turn, clearly (1) speaks to the development of the real property owned at the time by Raoul Land Development, (2) refers to the impending creation of the Charter, the Bylaws, the Association, and the Board, and (3) identifies the "Developer" as Raoul Land Development "and its successors and assigns." Thus, what little there is in the deed pertaining to the rights and interests as the Developer suggests that New Life would indeed succeed to Raoul Land Development's rights and interests in this regard.

The record contains two documents essential to the transaction between Raoul Land Development and New Life – the Purchase and Sale Agreement and the deed. We have evaluated both documents in order to ascertain the intent of the parties to this transaction. From our review of the language of the Purchase and Sale Agreement and the parties' actions in carrying out that contract, as it pertains to the real property through execution of the deed,

---

[12]Tennessee law provides that a deed conveys all of a grantor's estate or interest unless it clearly expresses an intent to limit the estate or interest conveyed. Tenn. Code Ann. § 66-5-101 (2004); *Cellco P'ship v. Shelby Cnty.*, 172 S.W.3d at 587. We discern no limiting intent in the deed in this case.

we conclude that it was the intent of the parties that New Life acquire Raoul Land Development's rights and interests as the Developer of Cooley's Rift.[13]

As a final matter, the Homeowners, citing cases from Illinois, South Carolina, and Vermont,[14] argue that Raoul Land Development's rights and interests as the Developer were personal and did not run with the land, and thus there must be evidence of a specific intent on the part of Raoul Land Development to convey the rights and interests. This argument misses the point. The circumstances described above do indeed reflect an intent on the part of Raoul Land Development to transfer its rights and interests, including its rights and interests as the Developer, to New Life.

**B.**

With respect to the issue of whether New Life became the Developer of Cooley's Rift, we are not unmindful that beyond the interpretation of the Purchase and Sale Agreement and the deed lies the construction of the Charter and the Bylaws. As previously mentioned, the rights and interests of the Developer, as they are referred to in this case, ultimately concern rights of governance under the Association's Charter and Bylaws. Article 10 of the Charter provides as follows:

> The rights, duties and functions of the Board of Directors shall be solely exercised by Raoul Land and Development Company until such time as Raoul Land and Development Company in its sole discretion determines to call a special meeting of the members of the corporation to elect a Board of Directors to succeed Raoul Land and Development Company.

---

[13]We also note that the Homeowners have pointed to nothing indicating that Raoul Land Development ever attempted to exert any rights or interests with respect to the real property or the Association after the transaction with New Life. The record before this Court does not show any such attempt, even through multiple meetings of the Board and the Association to consider New Life's development plans and the amendments to the Declaration. The conspicuous absence of Raoul Land Development buttresses the conclusion that it intended to transfer its rights and interests as the Developer to New Life. *See Frierson v. International Agric. Corp.*, 24 Tenn. App. 616, 632, 148 S.W.2d 27, 37 (1940) (stating that the course of conduct pursued by the parties is strong evidence of what was originally intended in a contract).

[14]*See Peoples Fed. Sav. & Loan Ass'n of S. C. v. Resources Planning Corp.*, 596 S.E.2d 51 (S.C. 2004); *Larkin v. City of Burlington*, 772 A.2d 553 (Vt. 2001); *Board of Managers of Medinah on Lake Homeowners Ass'n v. Bank of Ravenswood*, 692 N.E.2d 402 (Ill. App. Ct. 1998); *Toepper v. Brookwood Country Club Rd. Ass'n*, 561 N.E.2d 1281 (Ill. App. Ct. 1990); *Fairways of Country Lakes Townhouse Ass'n v. Shenandoah Dev. Corp.*, 447 N.E.2d 1367 (Ill. App. Ct. 1983).

The Bylaws do not contain a section of definitions, but Article 4.01 contains language addressing membership in the Association that states, "Raoul Land and Development Company, a Tennessee corporation (the 'Developer') . . . ." The language of the Charter and the Bylaws stands in contrast to that of the Declaration, which contains an explicit section of definitions in which "Developer" is defined as "Raoul Land and Development Company, a Tennessee corporation, and its successors and assigns." Based on this provision, the Homeowners argue that while New Life may have become the Developer for purposes of the Declaration, only Raoul Land Development could have been the Developer for purposes of the Charter and the Bylaws.

We need not tarry long on the Bylaws. Article 8.04 of the Bylaws provides that in the event of any conflict between the Declaration and the Bylaws, the Declaration shall control and govern. Thus, to the extent the Bylaws define or refer to the Developer differently than the Declaration, the explicit definition of Developer in the Declaration controls.

As for the Charter, we note that the provision allowing the Developer to designate members of the Interim Board – one of the linchpins of the Homeowners' challenge to the validity of the amendments – is actually in Article 5.02(a) of the Bylaws. As stated above, New Life qualifies as the Developer for purposes of the Bylaws.

The Homeowners would have this Court interpret the language of the Charter and the Declaration to mean that New Life qualifies as the Developer under the Declaration but not under the Charter. In other words, the Homeowners suggest that Raoul Land Development somehow intended to convey its rights and interests as the Developer to New Life, but only insofar as Raoul Land Development was the Developer under the Declaration, not under the Charter. We cannot adopt this forced construction.

The rules governing the construction of corporate charters are generally the same as those that govern the construction and interpretation of statutes, contracts, and other written instruments. 7A William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Private Corporations* § 3640 (perm. ed., rev. vol. 2006) ("Fletcher"). As such, construction of a corporate charter is a question of law. *See Gautreaux v. Internal Med. Educ. Found., Inc.*, 336 S.W.3d 526, 531 (Tenn. 2011) (construction of statute is a question of law); *Hamblen Cnty. v. City of Morristown*, 656 S.W.2d at 335-36 (interpretation of a written contract is a question of law). In construing a corporate charter, courts must give effect to the intent of the parties as revealed by the language of the charter and the circumstances surrounding its creation. 7A Fletcher § 3640; *see Penske Truck Leasing Co. v. Huddleston*, 795 S.W.2d at 671; *Pinson & Assoc. Ins. Agency, Inc. v. Kreal*, 800 S.W.2d at 487. Additionally, courts must adopt a sensible meaning and construe a charter to avoid absurd consequences. 7A

Fletcher § 3643; *see Fletcher v. State*, 951 S.W.2d 378, 382 (Tenn. 1997); *Turner v. Eslick*, 146 Tenn. 236, 247, 240 S.W. 786, 789 (1922).

Applying these principles to this case, we decline to adopt the forced construction urged by the Homeowners. The circumstances surrounding the creation of the Charter include the preceding creation of the Declaration, which explicitly references the impending creation of the Association. The Charter explicitly references the Declaration. The Charter and the Declaration clearly refer to development activities, and the very creation of the Charter and the establishment of the Association are part of those development activities. The Declaration obviously contemplates that another person or entity may succeed to Raoul Land Development's role as the Developer and that this role involves multiple rights and duties with respect to the Association. These circumstances militate against the Homeowners' suggested interpretation. In our view, the more sensible interpretation, which harmonizes the Charter, the Bylaws, and the Declaration, is that New Life succeeded to all of Raoul Land Development's rights and interests as the Developer of Cooley's Rift. Furthermore, as previously discussed, this interpretation is consistent with the intent of the parties in their business transaction that Raoul Land Development transfer its rights and interests as the Developer to New Life.

## C.

The Homeowners make one additional argument as to why New Life is not the Developer of Cooley's Rift, although this argument seemingly pertains equally to the Charter, the Bylaws, and the Declaration. The Homeowners contend that for New Life to engage in development activities, it would have to violate its corporate charter. The Homeowners assert that New Life's charter specifies that it shall not engage in any activity not permitted of a § 501(c)(2) organization.[15] They further assert that development activity is not permitted of a § 501(c)(2) organization. According to the Homeowners, a § 501(c)(2) organization is one that is "organized for the exclusive purpose of holding title to property, collecting income therefrom, and turning over the entire amount thereof, less expenses, to an organization which itself is exempt under this section." *See* 26 U.S.C. § 501(c)(2). Thus, argue the Homeowners, New Life cannot be a developer because such activities would violate its charter.

The trial court, in spite of ruling for New Life on all of the Homeowners' enumerated claims from both complaints, entered as part of its final order an injunction prohibiting New Life "from engaging in any development which would be a prohibited activity under Article VIII, Section (e) of its Charter." Article VIII, Section (e) of New Life's charter specifies that

---

[15]26 U.S.C. § 501(c)(2) (2006).

New Life shall not engage in any activity not permitted of a § 501(c)(2) organization. The Court of Appeals vacated the injunction in light of its remand for further proceedings. *Hughes II*, 2011 WL 1661605, at *11. As for the Homeowners' argument, the Court of Appeals declined to consider whether New Life's status as a § 501(c)(2) organization precluded it from acting as a developer, stating that New Life's tax-exempt status was "a matter for determination by the Internal Revenue Service." *Hughes II*, 2011 WL 1661605, at *5 n.6.

The Homeowners take pains to point out in their brief filed in this Court that they are not seeking to pursue a quo warranto action. The substance of their claim, nevertheless, is a challenge to New Life's assumption of development rights based on a contention that such activity is beyond the powers set forth in New Life's charter. The Homeowners contest New Life's purported "right to control the Homeowners Association," or in other words to exercise the rights, duties, and functions of the Board under Article 10 of the Charter and Article 5.02 of the Bylaws, including the right to designate the Interim Board.

Tennessee law restricts the parties who may challenge corporate action on the ground that the corporation lacks or lacked power to so act. Those parties who may bring such challenges generally include the Attorney General and Reporter, a director of the corporation, or a member of the corporation in a derivative proceeding. *See* Tenn. Code Ann. § 48-53-104 (2002); *see generally* 7A Fletcher § 3448. Simply put, the Homeowners are not qualified to assert, as a basis for relief, that New Life's assumption and exercise of rights as the Developer of Cooley's Rift is invalid because such action violates its charter. Furthermore, like the Court of Appeals, we conclude that the tax implications of New Life's development activities are not before this Court. *See Hughes II*, 2011 WL 1661605, at *5 n.6.

The trial court, as part of its final order, enjoined New Life from engaging in any development activity that would be a prohibited activity under its charter. We have concluded that the Homeowners' claim for injunctive relief in this regard was beyond the scope of their standing. Therefore, we vacate the trial court's final order insofar as it enjoins New Life's activities on this basis.

## III.

Having determined that New Life acquired Raoul Land Development's rights and interests as the Developer, we can now turn to the Homeowners' argument assailing the validity of the amendment process. The fundamental theory underlying the Homeowners' argument is that New Life was not the Developer for purposes of the Charter and the Bylaws. Because we have concluded otherwise, the Homeowners' remaining contentions, all of which depend on this theory, must fail. The Individual Defendants were properly appointed to the

Interim Board. The Interim Board therefore had authority to call a special meeting of the Association to consider the proposed amendments.

Our conclusion that New Life acquired Raoul Land Development's rights and interests as the Developer under the Charter, Bylaws, and Declaration has a direct bearing on the majority of the Homeowners' remaining claims for relief. Several of the Homeowners' claims are derivative causes of action purportedly brought in the right of the Association pursuant to Tenn. Code Ann. § 48-56-401 (2002). In particular, in Case No. 18,956, the Homeowners' second and third claims are derivative actions; one to enforce the restrictive covenants and the other for an injunction quia timet. As we have already noted, the record does not contain the complaint from Case No. 18,444. The Court of Appeals set forth the seven counts from Case No. 18,444 in its first opinion, four of which were derivative causes of action. *Hughes I*, 2009 WL 400635, at *2.

New Life filed a motion for a summary judgment as to the claims in Case No. 18,444. The Homeowners filed a motion for a summary judgment as to the claims in Case No. 18,956. The trial court found that the Homeowners lacked standing to pursue the derivative causes of action and granted a summary judgment to New Life with respect to all such claims.[16] The Court of Appeals agreed. *Hughes II*, 2011 WL 1661605, at *5. So do we.

**A.**

The standards by which appellate courts review a decision to grant or deny a motion for a summary judgment are well-known. A summary judgment is appropriate in virtually every civil case that can be resolved on the basis of legal issues alone. *Green v. Green*, 293 S.W.3d 493, 513 (Tenn. 2009); *Fruge v. Doe*, 952 S.W.2d 408, 410 (Tenn. 1997); *Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn. 1993). A summary judgment is not appropriate when genuine disputes regarding material facts exist. Tenn. R. Civ. P. 56.04. Accordingly, a summary judgment is appropriate only when the undisputed facts, and the inferences in the non-moving party's favor reasonably drawn from these facts, require granting a judgment as a matter of law. *Eskin v. Bartee*, 262 S.W.3d 727, 732 (Tenn. 2008); *Griffis v. Davidson*

---

[16]We note that the trial court granted New Life a summary judgment in Case No. 18,956 even though the only motion for a summary judgment in that case had been filed by the Homeowners. New Life had previously filed a motion for a summary judgment in Case No. 18,444. Although rare, a trial court may grant a summary judgment in favor of a non-moving party, but only with meticulous care to ensure that the party against whom judgment is granted has had a full and fair opportunity to fully address the issues. *Cumulus Broad., Inc. v. Shim*, 226 S.W.3d 366, 374 (Tenn. 2007); *Thomas v. Transp. Ins. Co.*, 532 S.W.2d 263, 266 (Tenn. 1976). Having reviewed the record in this case, we have concluded that the Homeowners had a full and fair opportunity to address the issue of whether they had sufficient voting power under the Bylaws to qualify for filing a derivative action.

*Cnty. Metro. Gov't*, 164 S.W.3d at 283-84; *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000).

An order granting a summary judgment is not entitled to a presumption of correctness on appeal. *Bailey v. Blount Cnty. Bd. of Educ.*, 303 S.W.3d 216, 226 (Tenn. 2010); *Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 703 (Tenn. 2008). Thus, appellate courts reviewing an order granting a summary judgment must make a fresh determination that the requirements of Tenn. R. Civ. P. 56 have been satisfied. *Eskin v. Bartee*, 262 S.W.3d at 732; *Eadie v. Complete Co.*, 142 S.W.3d 288, 291 (Tenn. 2004). The reviewing court must consider the evidence in the light most favorable to the non-moving party and must resolve all reasonable inferences in the non-moving party's favor. *Mills v. CSX Transp., Inc.*, 300 S.W.3d 627, 632 (Tenn. 2009); *Green v. Green*, 293 S.W.3d at 514.

**B.**

There are no genuine disputes as to material facts with regard to the Homeowners' derivative claims in Case No. 18,444 and Case No. 18,956. The dispositive issue is standing. The Homeowners assert that they had standing to pursue derivative claims because they had five percent or more of the voting power of the Association. *See* Tenn. Code Ann. § 48-56-401(a)(1). The record demonstrates otherwise.

Article 4.02 of the Bylaws speaks to voting rights. It provides that members of the Association are entitled to one vote for each homesite in which they hold an interest. Only one vote may be cast per homesite, even when more than one person holds an interest in the homesite. The Developer, however, is entitled to five votes for each homesite it owns.

The Homeowners collectively own two homesites and are therefore entitled to two votes. New Life owns eleven homesites and is therefore entitled to fifty-five votes. There are eleven remaining homesites, with various owners, which when combined, amount to eleven votes. The Homeowners, therefore, have two of sixty-eight total votes, or 2.9% of the voting power of the Association. Accordingly, the Homeowners may not bring derivative claims in the right of the Association. *See* Tenn. Code Ann. § 48-56-401(a)(1). The trial court correctly granted New Life a summary judgment as to the Homeowners' derivative claims.

**IV.**

We next turn to the effect of the amendments on the Homeowners' remaining claims – chief among them the request to enforce implied restrictive covenants arising from a general plan of development to New Life's property that lies outside the platted subdivision.

In reviewing the trial court's grant of judgment on the pleadings in *Hughes I*, the Court of Appeals determined that the express covenants in the Declaration applied only to the platted subdivision lots, and thus the trial court properly granted judgment on the pleadings as to the Homeowners' claims premised upon extending the express covenants beyond the platted lots. *Hughes I*, 2009 WL 400635, at *5.

However, the Court of Appeals also determined that a question remained as to the existence of implied restrictive covenants, based on a general plan of development, applicable to New Life's property outside the platted subdivision. The question arose from what the Court of Appeals found to be an ambiguity in the Declaration. *Hughes I*, 2009 WL 400635, at *6-9. Thereafter, New Life sought to address the ambiguity by proposing amendments to the Declaration.

**A.**

The amendments addressed multiple provisions in the Declaration. While some aimed merely to clarify New Life's role as the Developer of Cooley's Rift, the majority of the changes were more substantive. The Court of Appeals ably summarized the amendments as follows:

> Article 1.06 defines "common properties" to be deeded or leased to the [Association] and to be devoted to "the common use and enjoyment of the Owners." The amendment changed the definition by deleting "wilderness preserve areas" from the list of items included in common properties.
>
> . . .
>
> Article 1.11 defines "dwelling." The original restrictions defined dwelling as "any building situated upon the Property designated and intended for use and occupancy by a single family, including any single-family detached house located within the Property." The amendments added the following phrase to the definition: "or shall mean any building situated upon the Property designated and intended for use and occupancy other than [for] a single family if such other use is specifically consented to by Developer or the Board in writing."
>
> Article 1.14 defines "homesite." The original restrictions stated that a homesite was an unimproved parcel of land intended as a

-21-

site for a dwelling as shown on the recorded subdivision map. The amendments provide that a homesite is a parcel "designated" as a site for a dwelling on the recorded map "or as otherwise permitted by this Declaration."

Article 1.16 defines "master plan." In the original restrictions, the master plan was defined to refer to "the drawing which represents the conceptual land plan for the future development of Cooley's Rift Preserve prepared by DM Survey, Inc." The amendments state that the master plan shall refer to "the most recent conceptual land plan for the future development of Cooley's Rift Preserve prepared by or on behalf of Developer, as adopted, amended or modified from time to time by Developer, in its sole and absolute discretion." (The next sentence of Article 1.16 , which was not changed by the amendments, provides that the master plan shall refer to the most recent revisions thereof.)

Article 2.01 defines "property." This article was amended to eliminate references to landscaping and maintenance of recreational facilities, conservation purposes, and wilderness preserves with hiking and riding trails. In their original form, the restrictions stated, "The Master Plan shall not bind the Developer, its successors and assigns, to adhere to the Master Plan in the development of the land shown thereon except as to the general location and approximate acreage of the Common Properties." The amendments specify that the developer is to be bound by the master plan only as to common properties created pursuant to [Article] 1.06. Furthermore, the amendments take out qualifying language in the last sentence of Article 2.01 (making the developer's powers subject to limitations stated previously in the paragraph). The final sentence of Article 2.01 now states: "The Developer shall have full power to add to, subtract from or make changes in the Master Plan, in its sole and absolute discretion."

Article 3.02 generally limits homesites to residential use. The amendments add the following qualification: "unless such other use is specifically consented to by Developer or the Board in

writing and approved, if required, by all applicable governmental authorities."

Article 3.03 generally prohibits the use of homesites for multi-family residences, business purposes, or for equipment inconsistent with ordinary residential uses. The amendments add the following qualification: "[u]nless such other use is specifically consented to by Developer or the Board in writing and approved, if required, by all applicable governmental authorities."

Article 3.06 generally limits homesites to one dwelling and prohibits the resubdividing of homesites. The amendments again add qualifying language: "unless such other use is specifically consented to by Developer or the Board in writing and approved, if required, by all applicable governmental authorities."

*Hughes II*, 2011 WL 1661605, at *5-7. The amendments were considered at a special meeting of the Association on June 28, 2009. Article 11.02 of the Declaration specifically provides that the Declaration may be amended, without substantive limitation, upon an affirmative 75% vote of those owners who are in attendance or represented at the meeting. The vote by members present in person and by proxy was sixty-three in favor to three opposed, or 95% in favor.[17]

**B.**

The trial court, in granting a summary judgment to New Life after the remand by the Court of Appeals and the adoption of the amendments to the Declaration, found that "the amendments defining common properties and excluding wilderness preserves with hiking and riding trails have resolved any ambiguities with regard to implied restrictive covenants that might exist under a general plan of development." The trial court continued, "The result is the remanded questions by the Court of Appeals as to (1) the express restrictive covenants, and (2) implied restrictive covenants arising from a general plan of development are resolved in Defendant's favor such that those issues no longer prevent future development by a properly constituted developer."

---

[17]The vote per homesite was nineteen in favor to three opposed, or 86% in favor. Article 11.02(b) of the Declaration provides that in amending the Declaration, New Life, as the Developer, was entitled to five votes per homesite it owned per Article 4.02(b) of the Bylaws.

-23-

On appeal, the Court of Appeals again reversed the trial court's judgment and remanded the case for further proceedings. *Hughes II*, 2011 WL 1661605, at *9. The Court of Appeals made no substantive ruling regarding whether the amendments resolved any ambiguity in the Declaration. Instead, the Court of Appeals concluded that because the amendments were adopted by less than 100% of the property owners in the subdivision, the amendments were subject to judicial review under a "reasonableness" standard. The Court of Appeals therefore remanded for the trial court to determine whether the amendments "are reasonable in light of the original intent of the contracting parties and the totality of the surrounding circumstances, including whether the purchasers were apprised that such amendments could be made and whether the amendments materially change the character of the development." *Hughes II*, 2011 WL 1661605, at *9.

In reaching its decision, the Court of Appeals looked for guidance to Sections 6.10, 6.13, and 6.21 of the Restatement (Third) of Property: Servitudes (2000). *Hughes II*, 2011 WL 1661605, at *7-8. The Court of Appeals also found guidance in caselaw from other jurisdictions on the issue of amendment of restrictive covenants by less than 100% of property owners. *Hughes II*, 2011 WL 1661605, at *8. Lastly, the Court of Appeals drew upon the case of *Wilson v. Woodland Presbyterian Sch.*, No. W2001-00054-COA-R3-CV, 2002 WL 1417064 (Tenn. Ct. App. June 25, 2002), *perm. app. denied* (Tenn. Dec. 9, 2002). *Hughes II*, 2011 WL 1661605, at *9. From these sources, the Court of Appeals concluded that the amendments to the Declaration, adopted by the Association in conformance with its 75% super-majority requirement but by less than 100% of the members, are subject to a reasonableness test upon judicial review that inquires into the original intent of the contracting parties and the totality of the circumstances, including whether purchasers were apprised that such amendments could be made and whether the amendments materially change the character of the development. We respectfully decline to adopt this approach.

## C.

A property owner's right to own, use, and enjoy private property is a fundamental right. *McArthur v. East Tenn. Natural Gas Co.*, 813 S.W.2d 417, 419 (Tenn. 1991); *State v. Gainer*, 22 Tenn. (3 Hum.) 39, 40 (1842). As such, this Court has held that

> every proprietor of land, where not restrained by covenant or custom, has the entire dominion of the soil and the space above and below to any extent he may choose to occupy it, and in this occupation he may use his land according to his own judgment, without being answerable for the consequences to an adjoining owner, unless by such occupation he either intentionally or for

-24-

want of reasonable care and diligence inflicts upon him an injury.

*Humes v. Mayor of Knoxville*, 20 Tenn. (1 Hum.) 403, 407 (1839). Not surprisingly, then, Tennessee law does not favor restrictive covenants, because they are in derogation of the rights of free use and enjoyment of property. *Williams v. Fox*, 219 S.W.3d 319, 324 (Tenn. 2007); *Arthur v. Lake Tansi Vill., Inc.*, 590 S.W.2d 923, 927 (Tenn. 1979) (citing *Waller v. Thomas*, 545 S.W.2d 745, 747 (Tenn. Ct. App. 1976)).

Nevertheless, residential developments subject to restrictive covenants and governed by homeowners' associations, such as Cooley's Rift, have rapidly proliferated in recent decades. Lee Anne Fennell, *Contracting Communities*, 2004 U. Ill. L. Rev. 829, 829 (2004) ("Fennell"). The concept dates back to at least the eighteenth-century English practice of building a cluster of homes around a common square. Fennell, 2004 U. Ill. L. Rev. at 834-35. Yet only in the last fifty years has the practice accelerated in the United States. According to the Community Associations Institute, more than 63,000,000 Americans live in an estimated 323,600 association-governed communities. *See* Industry Data, http://www.caionline.org/info/research/Pages/default.aspx (last visited Oct. 24, 2012). These residential developments are diverse, comprising everything from a single condominium building to a large neighborhood of single-family homes. What they all have in common, however, is the practice of using restrictive covenants to privately control land use. Fennell, 2004 U. Ill. L. Rev. at 830.

Many such communities are created by a single developer who, before selling any individual units in the community, drafts and records a master deed or declaration of covenants and restrictions intended to bind each purchaser in the community. Stewart E. Sterk, *Minority Protection in Residential Private Governments*, 77 B.U. L. Rev. 273, 277 (1997) ("Sterk"). The developer also creates an association to govern the community and drafts bylaws for the association, which typically provide for a board of directors, define the scope of the board's power, and specify the procedures the board must follow in its everyday governance of the community. Sterk, 77 B.U. L. Rev. at 277-78. Notably, the declaration often provides for its own amendment. Sterk, 77 B.U. L. Rev. at 277.

The development of Cooley's Rift is not unlike the typical scenario just described. It was begun by Raoul Land Development, which recorded the Declaration and created the Association. The Declaration provided for its own amendment, without substantive limitation, by a 75% super-majority of the Association. We have already determined that the Association amended the Declaration in accordance with the applicable procedures. What we are now called upon to examine is the extent to which the courts will sit in judgment of the private decision-making in this community structure.

**D.**

The restrictive covenants in the Declaration in this case are property interests that run with the land, but they arise from a series of overlapping contractual transactions. *See Maples Homeowners Ass'n v. T & R Nashville Ltd. P'ship*, 993 S.W.2d 36, 38-39 (Tenn. Ct. App. 1998). Accordingly, they should be viewed as contracts and examined as such. *See Maples Homeowners Ass'n v. T & R Nashville Ltd. P'ship*, 993 S.W.2d at 39.

Contract law in Tennessee plainly reflects the public policy allowing competent parties to strike their own bargains. *Ellis v. Pauline S. Sprouse Residuary Trust*, 280 S.W.3d 806, 814 (Tenn. 2009) (citing 21 Steven W. Feldman, *Tennessee Practice: Contract Law & Practice* § 1:6, at 17 (2006)); *Hafeman v. Protein Discovery, Inc.*, 344 S.W.3d 889, 900 (Tenn. Ct. App. 2011). Courts do not concern themselves with the wisdom or folly of a contract, *Chapman Drug Co. v. Chapman*, 207 Tenn. 502, 516, 341 S.W.2d 392, 398 (1960), and they cannot countenance disregarding contractual provisions simply because a party later finds the contract to be unwise or unsatisfactory. *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 223 (Tenn. Ct. App. 2002); 28 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 70:209, at 232 (4th ed. 2003).

These contract principles, applied in the context of a private residential development with covenants that are expressly subject to amendment without substantive limitation, yield the conclusion that a homeowner should not be heard to complain when, as anticipated by the recorded declaration of covenants, the homeowners' association amends the declaration. *See* Sterk, 77 B.U. L. Rev. at 282. When a purchaser buys into such a community, the purchaser buys not only subject to the express covenants in the declaration, but also subject to the amendment provisions of the declaration. Sterk, 77 B.U. L. Rev. at 282. And, of course, a potential homeowner concerned about community association governance has the option to purchase a home not subject to association governance. Sterk, 77 B.U. L. Rev. at 301. As one commentator has noted, people who live in private developments "are not just opting for private ordering in the form of covenants, but also are opting for a privatized form of collective decision making that can undo, replace, modify, or augment the private ordering already achieved." Fennell, 2004 U. Ill. L. Rev. at 848.

For this reason, we decline to subject the amendments to the Declaration in this case, adopted by the requisite 75% super-majority, to the "reasonableness" test as announced by the Court of Appeals. We acknowledge that a homeowner's Lockean exchange of personal rights for the advantages afforded by private residential communities does not operate to

wholly preclude judicial review of the majority's decision.[18] However, because of the respect Tennessee law affords private contracting parties, we are reticent to inject the courts too deeply into the affairs of a majoritarian association that parties freely choose to enter.[19]

As cited by the Court of Appeals, other jurisdictions have implemented various permutations of "reasonableness" review of non-unanimous amendments to restrictive covenants. *See, e.g.*, *Miller v. Miller's Landing, L.L.C.*, 29 So. 3d 228, 235 (Ala. Civ. App. 2009) (finding amendment of restrictive covenant by super-majority of homeowners' association subject to reasonableness test); *Armstrong v. Ledges Homeowners Ass'n*, 633 S.E.2d 78, 87 (N.C. 2006) (finding that every amendment of restrictive covenants by homeowners' association must be reasonable in light of the contracting parties' original intent); *Bay Island Towers, Inc. v. Bay Island-Siesta Ass'n*, 316 So. 2d 574, 575-76 (Fla. Dist. Ct. App. 1975) (finding modification of restrictive covenants by majority of owners valid if not unreasonable with respect to the general scheme of the development).

We note that some of these cases involve amendments authorized by a simple majority vote. *See, e.g.*, *Armstrong v. Ledges Homeowners Ass'n*, 633 S.E.2d at 83-84; *Bay Island Towers, Inc. v. Bay Island-Siesta Ass'n*, 316 So. 2d at 575. We further note that some of the cases imposing a "reasonableness" test involve amendments made solely by a developer pursuant to a retained power rather than by a vote of a homeowners' association. *See, e.g.*, *Holiday Pines Prop. Owners Ass'n v. Wetherington*, 596 So. 2d 84, 87 (Fla. Dist. Ct. App. 1992) (stating that a developer's reserved power to modify restrictive covenants must be exercised in a reasonable manner so as not to destroy the general plan of development); *Flamingo Ranch Estates, Inc. v. Sunshine Ranches Homeowners, Inc.*, 303 So. 2d 665, 666 (Fla. Dist. Ct. App. 1974) (finding a developer's reserved power to modify restrictive covenants valid so long as it is exercised in a reasonable manner so as not to destroy the general scheme or plan of development).

It also bears mentioning that there is no clear "reasonableness" standard among the other jurisdictions. For example, in *Miller v. Miller's Landing, L.L.C.*, the court stated that in assessing what constitutes a reasonable manner consistent with the general plan of development, courts must look to the language of the covenants, their apparent import, and

---

[18] *See* Note, *Judicial Review of Condominium Rulemaking*, 94 Harv. L. Rev. 647, 659 n.60 (1981) (citing J. Locke, *Two Treatises of Government* §§ 95, 99 (T. Cooke ed. 1947) ("Whosoever . . . out of a state of nature unite into a community must be understood to give up all the power necessary to the ends for which they unite in society to the majority.")).

[19] As one commentator has queried, "The scope of association power may not be unlimited, but how do we decide what that scope is? Why are courts better situated to make that decision than the majority of homeowners as represented by their association?" Sterk, 77 B.U. L. Rev. at 287.

the surrounding facts, such as (1) whether the amendment was enacted in compliance with procedural requirements, (2) whether the amendment was enacted in a reasonable manner, e.g., whether the majority of owners acted with due regard for the rights of minority owners, and (3) whether the amendment represents a good faith attempt to adapt to changing circumstances. *Miller v. Miller's Landing, L.L.C.*, 29 So. 3d at 236. In contrast, in *Armstrong v. Ledges Homeowners Ass'n*, the court stated simply that reasonableness may be ascertained from the language of the original declaration of covenants, deeds, and plats, together with other objective circumstances surrounding the parties' bargain, including the nature and character of the community, and that courts reviewing a disputed amendment must consider both the legitimate needs of the homeowners' association and the legitimate expectations of lot owners. *Armstrong v. Ledges Homeowners Ass'n*, 633 S.E.2d at 88. Yet another standard evaluates (1) whether the decision is arbitrary or capricious, (2) whether the decision is discriminatory or evenhanded, and (3) whether the decision is made in good faith for the common welfare of the owners. *Worthinglen Condo. Unit Owners' Ass'n v. Brown*, 566 N.E.2d 1275, 1277-78 (Ohio Ct. App. 1989); *see also Buckingham v. Weston Vill. Homeowners Ass'n*, 1997 ND 237, ¶ 11, 571 N.W.2d 842, 845 (applying same three-part test to amendments to bylaws).

By way of contrast, we note that some jurisdictions do not appear to employ a "reasonableness" test as described above. For example, the Texas Court of Appeals evaluated an amendment to restrictive covenants that removed certain undeveloped lots from the legal description of lands subject to the declaration. *Bryant v. Lake Highlands Dev. Co. of Texas*, 618 S.W.2d 921, 922 (Tex. Civ. App. 1981). The amendment required a 90% super-majority of the homeowners' association, and it received seventy-seven votes in favor to three against, or 96% in favor. *Bryant v. Lake Highlands Dev. Co. of Texas*, 618 S.W.2d at 921-22. The court upheld the amendment, focusing simply on the fact that the declaration clearly allowed for amendment upon the requisite number of votes. The court noted that the developed lots were all affected alike, and that the effect of the amendment was merely to reduce the area subject to the original restrictions. But central to the court's decision was the recognition that the plaintiffs had purchased their lots subject to declarations which included a right of amendment, and thus the plaintiffs had no guarantee that the declaration would not be amended. *Bryant v. Lake Highlands Dev. Co. of Texas*, 618 S.W.2d at 923.

Likewise, the Missouri Court of Appeals reviewed an amendment to restrictive covenants that changed a restriction against subdividing lots. *LaBrayere v. LaBrayere*, 676 S.W.2d 522, 524 (Mo. Ct. App. 1984). The court noted that the amendment applied uniformly to all lots in the subdivision and that it had been adopted by the requisite number of owners. *LaBrayere v. LaBrayere*, 676 S.W.2d at 525. The court upheld the amendment, stating that "plaintiff disregards the fact that her property rights as owner . . . are subject to the terms imposed by that subdivision's restrictions" and that "the restrictions [permit] the

owners . . . to change, modify or amend the restrictions." *LaBrayere v. LaBrayere*, 676 S.W.2d at 525. The court also observed:

> As an owner of lots in a subdivision subject to use and occupancy restrictions, plaintiff owned property which both derived benefits and suffered burdens from those restrictions. One of the burdens was that the use and occupancy restrictions which affected plaintiff's lots and the other lots . . . were subject to change by the owners of less than all the lots.

*LaBrayere v. LaBrayere*, 676 S.W.2d at 525 (citations omitted).

Lastly, the Illinois Court of Appeals expressly rejected a "reasonableness" test in a case involving a homeowners' association that adopted uniformly applicable amendments to a declaration to restrict leasing. *Apple II Condo. Ass'n v. Worth Bank & Trust Co.*, 659 N.E.2d 93, 98 (Ill. App. Ct. 1995). The court distinguished between amendments adopted by a board of an association, which are valid only if affirmatively shown to be reasonable in purpose and application, and amendments adopted by association members. For amendments adopted by the association's membership, the court stated that "we will presume that the restriction is valid and uphold it unless it can be shown that the restriction is arbitrary, against public policy or violates some fundamental constitutional right of the unit owners." *Apple II Condo. Ass'n v. Worth Bank & Trust Co.*, 659 N.E.2d at 99.

We find these latter three cases instructive. Accordingly, we hold that the amendments to the Declaration in this case, uniform in application and adopted in conformance with the 75% super-majority procedures of the Declaration and the Bylaws, are subject to judicial review principally under an arbitrary and capricious standard.[20]

### E.

We note that we do not consider *Wilson v. Woodland Presbyterian Sch.*, No. W2001-00054-COA-R3-CV, 2002 WL 1417064 (Tenn. Ct. App. June 25, 2002) to be inconsistent with our decision today. The Court of Appeals relied upon *Wilson* as "the most factually similar" case in reaching its decision to adopt "reasonableness" review. *Hughes II*, 2011 WL 1661605, at *9. However, we find *Wilson* to be factually distinct in a significant way – namely that it involved a non-uniform amendment adopted by a simple majority. In *Wilson*, covenants restricted all lots in a subdivision to one or two-family dwellings. Woodland

---

[20]In so holding, we do not suggest that amendments which are against public policy, such as amendments which restrict ownership on the basis of race, are valid.

Presbyterian School, purchaser of two lots adjacent to the school, engineered a majority amendment that removed the restriction solely from its two lots so that it could construct a permanent playground. *Wilson v. Woodland Presbyterian Sch.*, 2002 WL 1417064, at *1. The court invalidated the amendment precisely because it was non-uniform. *Wilson v. Woodland Presbyterian Sch.*, 2002 WL 1417064, at *7 (citing Restatement (Third) of Property: Servitudes § 6.10(2) (2000)). In this case, however, we are not presented with a non-uniform amendment adopted by a simple majority. Rather, we have before us in this case uniform amendments adopted by a 75% super-majority.

Nor do we eschew the Restatement, although we do find that most of its provisions are not implicated by this case. For instance, the Court of Appeals noted that Section 6.21 prohibits a developer from exercising a power to amend or modify a declaration in a way that would materially change the character of the development or the burdens on the existing community members, unless the declaration fairly apprises purchasers of the power for the kind of change proposed. *Hughes II*, 2011 WL 1661605, at *7 (citing Restatement (Third) of Property: Servitudes § 6.21 (2000)). Regardless of the wisdom of this section, upon which we take no position, the case before us does not involve a power to amend reserved to the developer. The power to amend the Declaration in this case lay with the Association.

Likewise, the Court of Appeals noted Section 6.10 of the Restatement in reaching its decision. *Hughes II*, 2011 WL 1661605, at *7. Section 6.10 provides that non-uniform amendments or amendments that would otherwise violate the community's duties to its members under Section 6.13 are not effective without the approval of adversely affected members, unless the declaration fairly apprises purchasers that such amendments may be made. Restatement (Third) of Property: Servitudes § 6.10(2). Section 6.13, in turn, provides that the association has certain duties to the members of the community, including a duty to treat members fairly and "to act reasonably in the exercise of its discretionary powers including rulemaking, enforcement, and design-control powers." Restatement (Third) of Property: Servitudes § 6.13(1)(b), (c) (2000).

As we have noted, the amendments to the Declaration in this case are uniform, and Article 11.02 of the Declaration plainly identifies the Association's power to amend the Declaration by a 75% super-majority. Sections 6.10 and 6.13 of the Restatement would disapprove amendments that violate an association's duty to treat members fairly and to act reasonably in the exercise of its discretionary powers. The Restatement does not specifically define "fairly" or "reasonably" for purposes of Section 6.13. In our view, an association's duty to treat members fairly and to act reasonably in the exercise of discretionary powers is adequately addressed under the arbitrary and capricious standard of judicial review. To the extent that the Restatement or any of its comments suggest otherwise, we respectfully disagree.

-30-

**F.**

We now examine the amendments in this case for any indication that they are arbitrary or capricious. In its broadest sense, the arbitrary and capricious standard requires the reviewing court to determine whether there has been a clear error in judgment. *Jackson Mobilphone Co. v. Tennessee Pub. Serv. Comm'n*, 876 S.W.2d 106, 110-11 (Tenn. Ct. App. 1993). An arbitrary or capricious decision is one that is not based on any course of reasoning or exercise of judgment, or one that disregards the facts or circumstances of the case without some basis that would lead a reasonable person to reach the same conclusion. *Miller v. Civil Serv. Comm'n of Metro. Gov't of Nashville & Davidson Cnty.*, 271 S.W.3d 659, 665 (Tenn. Ct. App. 2008) (citing *City of Memphis v. Civil Serv. Comm'n of Memphis*, 216 S.W.3d 311, 316 (Tenn. 2007)).

In their brief filed with this Court, the Homeowners assail the amendments to the Declaration on two principal bases: (1) they do not apply uniformly, and (2) they grant New Life "unlimited unilateral power to change at its whim the Express Restrictive Covenants and the permissible use of any property within Cooley's Rift Preserve" or "the unilateral authority to dictate the use of every piece of property within Cooley's Rift Preserve and to change the Express Restrictive Covenants at its whim." We find both contentions unavailing.

The Homeowners assert that the amendments "contain absolutely no requirement that they apply uniformly" and that "the examples that New Life Development lists of potential changes that might be authorized illustrate its intention to apply non-uniform restrictions to Cooley's Rift Preserve." This assertion misses the point. Simply put, the amendments are clearly uniform. Whether varying uses of individual parcels of property will arise in conjunction with the Board's or the Developer's authority to consent in writing to such uses is a different question. That question lies in the future; it is not presently before this Court.

Additionally, the Homeowners' assertion that the amendments afford New Life "the unilateral authority to dictate the use of every piece of property within Cooley's Rift Preserve and to change the Express Restrictive Covenants at its whim" goes too far. The amendments afford the Board and the Developer the authority to consent in writing to certain varying uses of parcels of property, including non-residential use, multi-family use, and re-subdivision of homesites. We, however, do not view the amendments as granting New Life the unilateral authority to dictate the use of every piece of property and to change the express restrictive covenants at its whim.

In evaluating the amendments, we note that they were properly adopted by in excess of a 75% super-majority of the Association. The notice to the members of the Association regarding the proposed amendments specifically identified the Homeowners' lawsuit, Case

No. 18,444, and the dispute over the meaning and the impact of the Declaration in light of the first opinion of the Court of Appeals. The notice indicated that it was in the best interest of the Association that the terms of the Declaration be clear. In short, the record before this Court does not demonstrate anything arbitrary or capricious about the amendments.

## G.

Having determined that the amendments were properly adopted and survive judicial review, we turn to the question of whether the amended Declaration supports the implication of restrictions as to New Life's undeveloped land outside the platted subdivision. The trial court found no basis for implied restrictive covenants arising from a general plan or scheme based on the amended Declaration and granted New Life a summary judgment as to the Homeowners' claims in that regard. We agree with the trial court.

The construction of restrictive covenants, like other written contracts, is a question of law. *Massey v. R.W. Graf, Inc.*, 277 S.W.3d 902, 908 (Tenn. Ct. App. 2008). The amended Declaration no longer (1) references an intention to develop the Property as a residential community featuring wilderness preserves, (2) refers to a requirement for the Developer to adhere to a master plan with respect to the general location and approximate acreage of Common Properties, or (3) defines Common Properties as including wilderness preserve areas. What remains in the Declaration is (1) an express disclaimer of implied reciprocal covenants "with respect to lands which have been retained by the Developer for future development," (2) an express statement that the Developer may revise its development plan at any time, and (3) the Developer's reserved right to use or convey its property outside the platted subdivision with different restrictions than set forth in the Declaration or with no restrictions.

We are also mindful that courts construe restrictive covenants strictly because they are in derogation of the right to free use and enjoyment of property. *Williams v. Fox*, 219 S.W.3d at 324; *Arthur v. Lake Tansi Vill., Inc.*, 590 S.W.2d at 927 (citing *Waller v. Thomas*, 545 S.W.2d at 747). Any doubt concerning the applicability of a restrictive covenant will be resolved against the restriction. *Massey v. R.W. Graf, Inc.*, 277 S.W.3d at 908; *Parks v. Richardson*, 567 S.W.2d 465, 467-68 (Tenn. Ct. App. 1977). When the terms of a covenant may be construed in more than one way, courts must resolve any ambiguity against the party seeking to enforce the restriction and in a manner which advances the unrestricted use of the property. *Williams v. Fox*, 219 S.W.3d at 324 (citing *Hillis v. Powers*, 875 S.W.2d 273, 275-76 (Tenn. Ct. App. 1993); *Parks v. Richardson*, 567 S.W.2d at 468).

Based on all of these circumstances, we can only conclude that the amended Declaration does not serve as the basis for implied restrictive covenants, based on a general

-32-

plan or scheme, applicable to New Life's property outside the platted lots. Having discerned no genuine issue of material fact in dispute, we affirm the trial court's grant of a summary judgment in favor of New Life on this claim.

V.

The final issue we are called upon to address involves the Homeowners' claim that there are implied restrictive covenants arising from the 2002 plat that are applicable to New Life's property outside the platted subdivision. Before we address this issue, it is necessary to set forth what is before us in this respect and what is not.

A.

The controversy that is clearly before us with respect to the 2002 plat revolves around a purported designation on the plat for what the Homeowners refer to as two forest preserves, an East Preserve and a West Preserve, each with its own reference to a number of acres – 183.7 for the East Preserve and 542 for the West Preserve. The plat issue was explicitly linked to the two forest preserves in the first opinion of the Court of Appeals. *Hughes I*, 2009 WL 400635, at *9. The controversy with respect to the forest preserves has continued to the present appeal before this Court. In short, the Homeowners assert that the 2002 plat identified the forest preserves, and thus there arose an implied restrictive covenant prohibiting development on these areas. New Life asserts that the 2002 plat did not legibly identify the forest preserves, and thus no implied restrictive covenant arose.

What is not before us on this appeal is the Homeowners' argument that the 2002 plat created implied restrictive covenants by virtue of its identification of features other than the forest preserves, namely "Lake Louisa, Cooley's Rift Boulevard, Lake Louisa Loop, Connector Road, and Brow Road," and by virtue of "a special restriction that specified lots could only be developed for single-family residences." We again point out that the record does not contain the Homeowners' complaint in Case No. 18,444, nor does it contain any documents related thereto – such as New Life's answer, New Life's motion for judgment on the pleadings, or any response to the motion on behalf of the Homeowners. All the information we can glean with regard to the Homeowners' allegations in Case No. 18,444 about the implied-restrictive-covenants issue appears in the first opinion of the Court of Appeals. As mentioned above, the exclusive focus was the forest preserves. There was no mention of Lake Louisa, Cooley's Rift Boulevard, Lake Louisa Loop, Connector Road, Brow Road, or a single-family residence restriction. *Hughes I*, 2009 WL 400635, at *9.

In Case No. 18,956, the Homeowners requested an injunction "prohibiting the [Individual] Defendants from taking any action to enforce or apply any of the amendments

-33-

to the Homeowners Association Charter and Restrictive Covenants unlawfully adopted in the June 28, 2009 meeting." The complaint does contain some allegations that refer to Lake Louisa. More specifically, the Homeowners alleged that the Individual Defendants had brokered a deal with the City of Monteagle to allow the City to take water from Lake Louisa for resale and, to that end, install a pumping facility and pipeline on platted lots and/or the forest preserves. The Individual Defendants denied these allegations in their Answer. The Homeowners' motion for a summary judgment in Case No. 18,956 does not address these allegations, and instead it focuses exclusively on the Declaration amendment process.

Not surprisingly, given what is contained in the first opinion of the Court of Appeals, New Life's motion for a summary judgment in Case No. 18,444 does not address Lake Louisa, any of the aforementioned streets, or a single-family residence restriction. The first mention of these terms occurs in the Homeowners' response in opposition to New Life's motion for a summary judgment. While the forest preserves remained the central point of that filing, the Homeowners did eventually state that the plat contained clear references to other restrictions on development, including streets, Lake Louisa, and the special single-family residence restriction. Similarly, when the parties argued the two motions for summary judgment before the trial court, they provided little detail concerning the specific contents of the alleged restrictions on development. The central focus of the plat issue was on the forest preserves, but the Homeowners did bring up Lake Louisa, the streets, and the special single-family residence restriction, suggesting that New Life had constructive notice of them by virtue of the 2002 plat and that they served as the basis for unspecified implied restrictive covenants.

What was lacking throughout the proceedings below was any plain indication of the nature of the controversy. Nowhere in this record do the Homeowners offer clear details of the nature and extent of the purported restrictions. Nor do the Homeowners offer details as to how New Life's plans would violate the purported restrictions, other than vague references to selling water from Lake Louisa to the City of Monteagle and not preserving roads. The Homeowners' allegations seem to be less a concerted effort to advance a separate basis for implied restrictions based on these features and more an effort to bolster their central argument that the 2002 plat contains writing denoting the forest preserves.

The trial court did not specifically address these terms in its initial Memorandum and Order, focusing instead on the forest preserves. The trial court did not grant a summary judgment at that time. Instead, the trial court noted that the deed referred to a survey. Accordingly, the trial court found that New Life had constructive notice of the survey and, therefore, that the deed subjected the property to the notes and other matters shown on the survey. New Life filed a motion to alter or amend, purportedly attaching a copy of the survey

to dispel any claim that the survey would serve as a basis for implied restrictive covenants.[21] Thereafter, the trial court entered a final order simply granting New Life a summary judgment on the Homeowners' claim of implied restrictive covenants without further detailed findings.

The Court of Appeals, in its second opinion, pointed out that the trial court had not specifically addressed Lake Louisa, the streets, or the special single-family residence restriction. *Hughes II*, 2011 WL 1661605, at *10 n.11. The Court of Appeals itself declined to address the issue, in light of its decision to remand for further proceedings as to actual or inquiry notice of the forest preserves. *Hughes II*, 2011 WL 1661605, at *10.

We are now left to guess as to the controversy presented by Lake Louisa, the streets, and the special single-family residence restriction.[22] Although Lake Louisa was briefly mentioned in the Homeowners' complaint in Case No. 18,956, the allegations were disputed by New Life, and the Homeowners' motion for a summary judgment did not address the 2002 plat. As for Case No. 18,444, what we know of the complaint focused exclusively on the forest preserves. New Life sought a summary judgment on that issue, specifically contending that the 2002 plat contained no legible references to forest preserves and therefore provided no basis for implied restrictive covenants as to the purported forest preserves. That issue was addressed by the trial court, and it is the issue properly before this Court. The record in this case, such as it is, simply provides no basis for this Court to address the legal significance, if any, of the references on the 2002 plat to Lake Louisa, the streets, or the special single-family residence restriction.

**B.**

We turn now to the final issue before us, namely whether the 2002 plat served as the basis for implied restrictive covenants as to New Life's property outside the platted lots. The trial court found no basis for implied restrictive covenants because there were no legible inscriptions relating to the forest preserves on the recorded plat. The Court of Appeals

---

[21]The survey and the other two exhibits to New Life's motion to alter or amend are not included in the record.

[22]Although the Homeowners never specifically identify the special single-family residence restriction on the 2002 plat, we note that the 2002 plat does contain a legible stamp entitled "General Restrictions." This language, however, appears to pertain to the future installation of subsurface sewage disposal systems to serve the platted lots. We also note that the purported restriction states, "The following lots are restricted to the construction of a single family dwelling *or comparable daily flow*." (emphasis added). Of course, as mentioned earlier, the Declaration and the amended Declaration contain provisions regarding single-family dwelling restrictions.

reversed and remanded for further proceedings on the question of inquiry notice,[23] or "knowledge of facts and circumstances sufficiently pertinent in character to enable reasonably cautious and prudent persons to investigate and ascertain as to the ultimate facts." *Hughes II*, 2011 WL 1661605, at *10 (quoting *Texas Co. v. Aycock*, 190 Tenn. 16, 27, 227 S.W.2d 41, 46 (1950)). The Court of Appeals concluded that disputed facts remained as to whether New Life should have discovered what the "blurry words" on the 2002 plat said. *Hughes II*, 2011 WL 1661605, at *10. We respectfully disagree.

The 2002 plat consists of five sheets. Sheet 1 is a view of what appears to be the entire tract of land, including land surrounding the delineated lots of the subdivision. Because of the smaller scale on Sheet 1, virtually no writing on it with respect to the tract of land is legible. What is legible is a designation of the "Approximate County Line" between "Grundy County" and "Franklin County," and a designation of "Lake Louisa." The delineated lots are visible, but their numbering is not legible.

Sheets 2 through 5 are closer views of the platted lots and the area immediately surrounding them. The writing on Sheets 2 through 5 is plainly legible. The sheets delineate twenty-four[24] lots designated as numbered "tracts." They show named streets servicing the lots, including Cooley's Rift Boulevard, Lake Louisa Loop, Brow Road, and Connector Road, all of which are noted on the plat as private streets. In two locations on the identified streets are designations for temporary cul-de-sacs, with printed language indicating "to be abandoned upon the platting of the additional tracts on Lake Louisa Loop." They also show an irregularly-shaped area, designated as Lake Louisa, that abuts several of the lots. Additionally, they show third party interests, such as a gas line easement and a water line easement, neither of which crosses any of the platted lots, and an electrical transmission line right-of-way that does cross one of the platted lots. Sheets 2 through 5 contain printed words outside the boundaries of the platted lots, usually alongside the aforementioned streets, which state "Cooley's Rift Mountain Preserve - Future Development," "Raoul Land Company - Future Development," "Raoul Land Company," or simply "Future Development." However, Sheets 2 through 5 contain no designation of an East Preserve or a West Preserve.

---

[23]The Court of Appeals also referred to a question of whether New Life had actual notice, or actual knowledge of the forest preserves or of what the blurry words on the 2002 plat said. *Hughes II*, 2011 WL 1661605, at *10. The issue pursued by the Homeowners in their brief before this Court, and indeed in oral argument before the trial court, is one of inquiry notice. The question of actual notice is not before us.

[24]Printed language on the plat refers to twenty-seven lots, specifically referencing lots 1-8, 46-61, 0, 00, and 51A. Lots 59, 60, and 61, however, do not appear on the plat.

Restrictive covenants may be implied by reference to a plat. *Arthur v. Lake Tansi Vill., Inc.*, 590 S.W.2d at 927. The Homeowners liken this case to that of *Stracener v. Bailey*, 737 S.W.2d 536 (Tenn. Ct. App. 1986). In *Stracener*, two plats, each one for a separate phase of a residential development, contained language on the plat but outside the boundaries of the platted subdivision. The language designated an area as "Future Park" in one instance and "Reserved for Future Park" in the other. *Stracener v. Bailey*, 737 S.W.2d at 537. The court held that the original developer, by designating the area in question as a "Future Park" or "Reserved for Future Park," and then selling lots according to the plats, had created a restriction on the use of the property for any purpose inconsistent with that designation. *Stracener v. Bailey*, 737 S.W.2d at 539.

This case is quite different from *Stracener*. Unlike in *Stracener*, the 2002 plat in this case bears no legible reference to forest preserves. Sheets 2 through 5, which contain no illegible writing, contain no reference whatsoever to forest preserves. Sheet 1 contains virtually no legible writing with respect to the tract, and not surprisingly contains no legible reference to an East Preserve or a West Preserve. Thus, having examined all five sheets comprising the 2002 plat, we can only conclude that the 2002 plat does not clearly designate an East Preserve or a West Preserve in the manner the plats in *Stracener* designated a future park.

Recognizing this problem, the Homeowners advance a novel argument to buttress their claim that the 2002 plat supports the imposition of implied restrictive covenants. The Homeowners contend that what was on the 2002 plat was sufficient enough to put New Life on inquiry notice to determine what any illegible markings on the plat actually were. The Homeowners assert that had New Life contacted the surveyor, it would have led to the discovery of an unrecorded version of the plat containing legible writing designating an East Preserve and a West Preserve.

Tennessee recognizes the concept of inquiry notice. We have stated that "another kind of notice occupying what amounts to a middle ground between constructive notice and actual notice is recognized as inquiry notice." *Blevins v. Johnson Cnty.*, 746 S.W.2d 678, 683 (Tenn. 1988). In Tennessee, inquiry notice is a variation of actual notice. As this Court has stated, "The words 'actual notice' do not always mean in law what in metaphysical strictness they import; they more often mean knowledge of facts and circumstances sufficiently pertinent in character to enable reasonably cautious and prudent persons to investigate and ascertain as to the ultimate facts." *Blevins v. Johnson Cnty.*, 746 S.W.2d at 683 (quoting *Texas Co. v. Aycock*, 190 Tenn. at 27, 227 S.W.2d at 46). In other words, inquiry notice means that "whatever is sufficient to put a person on inquiry" is "notice of all

the facts to which that inquiry will lead," when pursued "with reasonable diligence and good faith." *Blevins v. Johnson Cnty.*, 746 S.W.2d at 683 (quoting *City Fin. Co. v. Perry*, 195 Tenn. 81, 84, 257 S.W.2d 1, 2 (1953)); *Stracener v. Bailey*, 737 S.W.2d at 539.

In this case, the trial court found that the 2002 plat did not put New Life on inquiry notice as to the existence of forest preserves. The trial court found that the 2002 plat contained no legible reference to an East Preserve or a West Preserve. Furthermore, although the Homeowners contended that Sheet 1 contained visible "legends" denoting an East Preserve and a West Preserve which should have put New Life on inquiry notice, the trial court found that the "legends" were actually "blobs" and did not put New Life on inquiry notice. We agree with the trial court in these respects.

There is no legible reference on the 2002 plat in the record to an East Preserve or a West Preserve. Our examination of the 2002 plat convinces us that the visible "legends" on Sheet 1 are indeed more like "blobs." Inquiry notice can be derived under circumstances where there exists a clear reference on a recorded instrument directing observers to an identifiable unrecorded instrument. *See Texas Co. v. Aycock*, 190 Tenn. at 26-27, 227 S.W.2d at 45-46 (finding inquiry notice of the terms of an unrecorded lease where the deed contained a clear reference to the lease). These are not the circumstances of this case. Absent a clear reference to the forest preserves on the 2002 plat, we conclude that New Life was not put on inquiry notice of the dedication and acreage of an East Preserve and a West Preserve. Regardless of whether the 2002 plat is characterized as containing "blobs" or "blurry words," the facts and circumstances are not "sufficiently pertinent in character to enable reasonably cautious and prudent persons to investigate and ascertain" the ultimate facts. *Texas Co. v. Aycock*, 190 Tenn. at 27, 227 S.W.2d at 46. The "blobs" or "blurry words" on Sheet 1 of the 2002 plat signify nothing of importance to an observer and direct the observer nowhere.

Accordingly, we agree with the trial court that there are no material facts in dispute. We affirm the trial court's grant of a summary judgment in favor of New Life on the Homeowners' claim that the 2002 plat serves as the basis for implied restrictive covenants as to New Life's property outside the platted subdivision.

## VI.

We affirm the decision of the Court of Appeals that the amendments to the Declaration and the Charter were properly adopted. Accordingly, we also affirm the conclusion of the Court of Appeals that the Homeowners' derivative claims should be dismissed for lack of standing. We vacate the portions of the judgment of the Court of Appeals remanding the case for further proceedings to consider the reasonableness of the

amendments to the Declarations and to determine whether the 2002 plat or a general plan of development provided a basis for recognizing implied restrictive covenants. We also affirm the trial court's grant of a summary judgment to New Life on all of the Homeowners' remaining claims. However, we vacate the portion of the trial court's order enjoining New Life from engaging in activity that would be prohibited under its charter. We remand the case to the trial court with directions to dismiss the Homeowners' complaints, and we tax the costs of this appeal to R. Douglas Hughes, M. Lynne Hughes, Louise Hubbs, and Guy Hubbs, for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUSTICE