IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 1, 2016 Session

## CLAYTON KELTNER, ET AL. v. ESTATE OF MARY LOIS SIMPKINS, ET AL.

**Appeal from the Chancery Court for Cheatham County**
**No. 15920     Robert E. Burch, Chancellor**

_____

**No. M2014-02023-COA-R3-CV – Filed March 29, 2016**
_____

This appeal involves a dispute arising from the plaintiff's attempted exercise of an option to purchase a tract of land. In part, the contract provided that "a fair and equitable price for said property will be established at a later date." The trial court held that the option was not enforceable because it was too vague with respect to price. The plaintiffs appealed. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and KENNY ARMSTRONG, J., joined.

Joseph M. Barrett and Jordan B. Osborn, Dickson, Tennessee, for the appellants, Clayton Keltner and Jacqueline Keltner.

B. Nathan Hunt and S. Allison Winters, Clarksville, Tennessee, for the appellees, Estate of Mary Lois Simpkins, Keith Thomas, Connie Thomas, and Vicky D. Weikal.

## OPINION

### I. BACKGROUND AND PROCEDURAL HISTORY

On October 17, 2006, Clayton and Jacqueline Keltner contracted with W.W. and Mary Lois Simpkins to purchase real property located in Cheatham County, Tennessee at 1401 Ross Hollow Road ("1401 Property"). The contract also purported to provide the

Keltners with an option to purchase adjacent tracts of land in the future. In pertinent part, the contract stated:

9.     Seller Grants and Buyer reserves an option to purchase any adjacent property now owned by the Seller if said property is ever placed on the general market for sale.

10.    Seller Grants and Buyer reserves an option to purchase any adjacent property now owned by the Seller but subsequently transferred to the Seller's children should Seller's children ever place said property on the general market for sale.

11.    Should Buyer exercise said option to purchase, a fair and equitable price for said property will be established at a later date.

The property at issue in this lawsuit is located adjacent to the 1401 Property at 1455 Ross Hollow Road ("1455 Property"). When W.W. Simpkins died in August 2010, the 1455 Property passed to Mary Lois Simpkins by operation of law. Then, when Mary Lois Simpkins died in September 2012, it passed to the Estate of Mary Lois Simpkins (the "Estate").

Following the death of Mary Lois Simpkins, the Keltners offered to purchase the 1455 Property from the Estate for $140,000. Thereafter, Alan and Carrie Binkley submitted an offer to purchase it for $165,000. The Estate gave the Keltners 24 hours to match the Binkleys' offer, but the Keltners declined to do so. On April 9, 2013, the Estate contracted with the Binkleys to sell the 1455 Property for $165,000. On or around May 16, 2013, the Keltners submitted written notice to the Estate that they intended to exercise their option to purchase the 1455 Property for $140,000. The Estate rejected the Keltners' offer, choosing instead to move forward with the sale of the property to the Binkleys.

On August 8, 2013, the Keltners filed a complaint in the Cheatham County Chancery Court naming the Estate and the Binkleys as defendants.[1] Among other things, the complaint sought a declaration of the Keltners' right to purchase the 1455 Property at a price deemed fair and equitable by the trial court. The parties jointly requested that the trial court enter a declaratory judgment addressing the validity of the October 2006 contract's option provision.

---

[1] The Keltners voluntarily dismissed the Binkleys from the lawsuit after learning that the Binkleys revoked their offer to purchase the 1455 Property in February 2014. Accordingly, the Keltners and the Estate are the only parties to this appeal.

The trial court heard oral arguments on the parties' agreed motion for declaratory judgment. On August 15, 2014, the trial court entered a memorandum opinion in which it held that the option was not enforceable because it was too vague with respect to price:

> The purchase price for the exercise of the option (i.e., for it to become a contract of sale) is not stated in the option but left to the parties to agree upon at some future date. It is, therefore, "an agreement to agree." For this reason, the option is unenforceable.

On September 8, 2014, the trial court entered an order incorporating its memorandum opinion and certifying its ruling on the validity of the option language as final. The Keltners filed a timely notice of appeal to this Court on October 2, 2014.

## II. ISSUE

The Keltners raise the following issue on appeal, slightly restated:

1. Whether the trial court erred in ruling that the option language was unenforceable.

## III. STANDARD OF REVIEW

The issue presented in this case requires the interpretation of a contract. The interpretation of a written agreement is a matter of law. *Hughes v. New Life Dev. Corp.*, 387 S.W.3d 453, 465 (Tenn. 2012). Our review of issues of law is de novo with no presumption of correctness accorded to the decision of the trial court. *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 308 (Tenn. 2009).

## IV. DISCUSSION

The only issue before us in this case is whether the October 2006 contract conferred on the Keltners an enforceable option to purchase the 1455 Property. In the proceedings below, the trial court held that the contract did not confer such an option because, without a specified price term, the parties made only an "agreement to agree." The Keltners argue that the contract's provision that "a fair and equitable price for said property will be established at a later date" reflects the parties' intent to provide a purchase price based on the property's fair market value.

This Court explained the manner in which an agreement without a specific price term should be analyzed in *Huber v. Calloway*, No. M2005-00897-COA-R3-CV, 2007 WL 2089753 (Tenn. Ct. App. July 12, 2007):

> The difference between a valid contract and an unenforceable agreement requires consideration of two related concepts: an expression of the parties' intent to be bound, and the definitiveness with which they state their terms. The courts' initial task is to determine whether the written contract is ambiguous. If the contract's language is plain and complete, the contracting parties' intentions must be gathered from the language of the contract alone. Accordingly, when the parties have reduced their contract to writing, their intentions should be contained in the four corners of the contract, and the contracting parties' rights and obligations should be governed by their written contract.

> Intent is revealed through an examination of the language chosen by the parties. This standard is an objective one, and the courts must determine intent by examining the meaning that a reasonable person would have derived from the words had such person been in the same situation as that of a party to the contract. The rules of contract construction come into play only when the court determines that the contract is ambiguous or incomplete. Contractual ambiguity arises only when contractual provisions may reasonably be read to have more than one meaning. It does not arise simply because the contracting parties interpret their contract differently. Thus, in the absence of fraud or mistake, the courts should construe unambiguous written contracts as they find them.

> Contracts that leave material terms open for further negotiations are generally too vague to be enforceable. However, the law does not favor the destruction of contracts, and a contract that lacks definitiveness of terms will be enforced if the terms can be reasonably ascertained from the language of the contract. Accordingly, where price is the unspecified material term, courts have enforced contracts that call for the price to be set by vague but ascertainable standards, such as "market price" or "prevailing rate."

> Contract provisions should be considered in the context of the entire contract. In addition, the language used in a contract should be given its natural and ordinary meaning. The courts should avoid strained constructions of contractual language that create contractual ambiguities where none, in fact, exist.

- 4 -

*Id*. at \*3-4 (citations omitted).

We cannot accept the Keltners' assertion that "a fair and equitable price for said property will be established at a later date" unambiguously reflects the parties' mutual intent to sell the 1455 Property at its fair market value.  The Keltners contend that a "fair and equitable price" is "one that is set solely on market factors."  However, the contract does not provide that the "fair and equitable price" will be established by market factors.  In fact, it does not specify what person(s) or method will establish the "fair and equitable price."  Rather, it provides only that the price "will be established."  As it often does, the parties' use of the passive voice in this instance led to vagueness.  *See* Bryan A. Garner, *Garner's Dictionary of Legal Usage* 659 (3d ed. 2011).  As the Keltners suggest, the contract may be reasonably interpreted to provide for a purchase price based on the fair market value of the property.[2]  However, as the Estate suggests, it may also be reasonably interpreted to provide for a purchase price reached after further negotiation and agreement of the parties.  As such, we must conclude that the purchase price is not reasonably ascertainable from the plain terms of the contract, and the option provision is therefore unenforceable.

## V. CONCLUSION

In light of the foregoing, we affirm the judgment of the trial court.  This matter is remanded to the trial court for such further proceedings as may be necessary and are consistent with this opinion.  The costs of this appeal are taxed to the appellants, Clayton Keltner and Jacqueline Keltner, and their sureties, for which execution may issue if necessary.

_____
ARNOLD B. GOLDIN, JUDGE

---

[2] Even accepting that the Keltners had a right to purchase the 1455 Property for its "fair market value," we fail to see how they would prevail given the facts of this case.  The Binkleys were willing to pay $165,000 to purchase the 1455 Property, and the Estate was willing to accept that amount for it. Moreover, the Binkleys' loan application to purchase the property at this price was approved.  Nothing in the record suggests that the Binkleys' offer was not legitimate.  Accordingly, it appears that the fair market value of the 1455 Property was $165,000.  *See* BLACK'S LAW DICTIONARY 1785 (10th ed. 2014) (defining fair market value as "[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's length transaction").  The Estate gave the Keltners the opportunity to purchase the 1455 Property at that price, and they declined to do so.